James K. Barbee, pro se
Ohio Bar License No. 0090306
Oregon Bar License No. 070242 (inactive)
Washington Bar License No. 29557 (inactive)
4723 Saddletop Ridge Lane
Mason, Ohio 45040
(513) 400-7511
jim@barbeclawfirm.com

## UNTIED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON DIVISION

| | |
|---|---|
| JAMES K. BARBEE, ) | Case No. _____ |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | |
| v. ) | **JURY TRIAL REQUESTED** |
| ) | |
| AMIRA NATURE FOODS, LTD.; ) | |
| KARAN A. CHANANA; BRUCE C. ) | |
| WACHA; VARUN SETHI and BRIAN M. ) | |
| SPECK, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiff James K. Barbee ("Barbee"), a licensed attorney appearing pro se, alleges as

follows:

### SUMMARY

1.      This action arises out of the acts, omissions and conduct of a foreign issuer of

securities (previously listed on the NYSE) and its officers and control persons, which constitute

violations of federal and state securities statutes, and involve intentional and negligent

misrepresentations of material facts, causing Barbee to incur out-of-pocket losses in excess of

$580,000.

2.     In short, defendants materially misrepresented results of operations in SEC filings for years (including overstating net investor equity, among other things) and they failed to timely disclose: (i) the SEC's previous notice of conditions precedent to avoid delisting; (ii) the insolvency (and liquidation proceedings) of the company's primary operating subsidiary; and (iii) internal litigation between the CEO and such subsidiary regarding a roughly $16.3 million debt to equity conversion.

3.     Worse yet, defendants never disclosed charges filed in 2019 by India's Central Bureau of Investigation against the company's CEO and others alleging a criminal conspiracy to commit fraud, stock manipulation and misappropriation of funds, based on events and conduct occurring before Barbee even started investing in Amira.

4.     Barbee seeks statutory damages, compensatory damages, lost-opportunity damages, market-adjusted damages, margin interest, statutory pre-judgment interest and costs, tax-adjusted damages, a reasonable attorney's fee and disgorgement of Barbee's pro-rata share of defendants' ill-gotten and ill-retained gains, pursuant to federal and state statutes and/or common law, in an amount according to proof at hearing or trial and not less than $1.2 million.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 or otherwise because Barbee's claims involve one or more violations of federal law, including § 10(b)(5) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] (the "Exchange Act") and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and control persons of those violating such law are liable therefore under § 20(a) of such statute.

///

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 or otherwise given the diversity of the parties, since Barbee is a resident of the State of Ohio and none of the defendants reside in Ohio, and given the amount in controversy, which far exceeds the jurisdiction threshold and is not less than $580,000.

7.     This Court has supplemental jurisdiction over Barbee's statutory state law securities act and common law tort claims pursuant to 28 U.S.C. § 1367(a) or for other reasons.

8.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     Venue is proper in the Trenton Division of this District because a substantial portion of the acts and omissions constituting the statutory violations and torts occurred in this Division and District, the company's CFO conducts business from within this Division and District on behalf of the company and he resides or has a principal place of business located in this Division and District, and defendants have received profits and compensation by engaging in conduct within this Division and District, or for other reasons.

## PARTIES

10.     Plaintiff Barbee is an individual who resides and resided in Mason, Ohio at all times relevant to this matter.

11.     Barbee is an attorney with knowledge of and experience litigating violations of state and federal securities laws.

12.     Neither Barbee's knowledge of state or federal securities laws nor his experience litigating violations thereof excuse any defendant's compliance therewith.

///

-3-

13.     Defendant Amira Nature Foods, LTD ("Amira" or the "Company"), is an entity organized under the laws of the British Virgin Islands, with its principal place of business located at 29E, A.U. Towers, Jumeirah Lake Towers in Dubai, United Arab Emirates.

14.     Amira primarily sells Basmati Indian specialty rice (a premium long-grain variety of rice), along with other third-party branded food products, including nutritious snacks, ready-to-heat meals and a line of organic food offerings.

15.     Amira was listed on the NYSE between October 2012 and August 2020.

16.     Defendant Karan A. Chanana ("Chanana") is and was the President and/or CEO of Amira at all relevant times.

17.     Chanana's business address is listed in filings with the U.S. Securities and Exchange Commission ("SEC") as being the same as Amira's principal place of business identified above.

18.     On information and belief, Chanana resides and has resided in Dubai or elsewhere in United Arab Emirates at all times relevant to this matter.

19.     After Amira went public in 2012, raising more than $80 million, Chanana remained the largest shareholder in Amira and he and his affiliates directly and indirectly received more than $50 million in the aggregate of the net public offering proceeds.

20.     When Amira was initially listed on the NYSE, it was the sole owner of another holding company, Amira Nature Foods, LTD ("Mauritius"), which itself held an 80.4% interest in Amira Pure Foods Private Limited ("Amira India"), Amira's largest and primary operating subsidiary, which was based in India, and Chanana (and some unidentified affiliates) held the remaining 19.6% interest in Amira India, assuming that Chanana and/or his affiliates ever

-4-

completed the purchase of 1.5 million shares of Amira India (various SEC filings at issue herein preface this as an "assumption" rather than as a statement of fact).

21.     Chanana certified the Forms 20-F at issue in this matter for Amira's fiscal years ending March 2017, March 2018 and March 2019, pursuant to §§ 302 and 1350 of the Sarbanes-Oxley Act of 2002, and he signed the Form NT-20-F for the fiscal year ending March 2019.

22.     Defendant Bruce C. Wacha ("Wacha") was the Chief Financial Officer ("CFO") of Amira and served as an Executive Director from June 2014 until at least August 2017, during which time he resided and/or worked in New York.

23.     On information and belief, Wacha currently resides in Connecticut and he works as a CFO for a company with its principal place of business in Norwalk, Connecticut.

24.     Wacha certified the Form 20-F for the fiscal year ending March 2017, pursuant to §§ 302 and 1350 of the Sarbanes-Oxley Act of 2002, but he resigned prior to (or almost immediately after) doing so, with his resignation from the Company being announced days after such certification.

25.     Defendant Varun Sethi ("Sethi") replaced Wacha, serving as CFO of Amira from August 2017 to June 2019, having previously worked in the corporate finance and financial reporting team for Amira from April 2012 to April 2013 and from July 2016 until his appointment as CFO.

26.     Sethi's business address was listed in SEC filings as being the same as Amira's principal place of business identified above.

27.     On information and belief, Sethi resides and resided in Dubai or elsewhere in United Arab Emirates at all times relevant to this matter.

-5-

28.     Sethi certified the Form 20-F for Amira's fiscal year ending in March 2018, pursuant to §§ 302 and 1350 of the Sarbanes-Oxley Act of 2002 and he resigned or was terminated by Amira prior to the SEC prescribed deadline for filing the Form 20-F covering the fiscal year ending March 2019.

29.     In addition to his previously promised salary, after or in connection with his departure from Amira, Sethi was issued 528,243 shares of common stock, and Sethi and the Company agreed that Sethi would return stock (or the Company would issue additional stock to Sethi) such that the number of shares held by Sethi on September 8, 2019 would ultimately have a value of $559,937, based on the closing price of Amira on September 8, 2019.

30.     Defendant Brian M. Speck ("Speck") replaced Sethi, serving as CFO of Amira from late June 2019 to the present.

31.     Speck works and worked for Brio Financial Group, out of its office located at 217 W. Main Street, Somerville, NJ 08876 (i.e., at a location within the Trenton Division of this District), at all times relevant to this matter.

32.     On information and belief, Speck resides and resided within this District or elsewhere in New Jersey at all times relevant to this matter.

33.     Speck certified the Form 20-F for the fiscal year ending March 2019, but he did not do so until August 2020 (i.e., more than one year after its originally prescribed due date under SEC guidelines and rules for foreign issuers).[1]

---

[1] As a foreign filer with a fiscal year ending March 31, Amira was permitted by SEC rules to report its annual earnings up to four months after the close of such fiscal year (and in Amira's case, the prescribed due date was the last business or trading day of July in the same calendar year in which the fiscal year closed).

34.     That filing occurred on August 18, 2020, the first full day that trading in Amira

was halted on the NYSE, and the NYSE prohibited all trading in the Company after such filing.[2]

## OTHER RELEVANT THIRD PARTIES

35.     Vince LaCava ("LaCava")  is a licensed securities broker and an associated person

with Financial Industry Regulatory Authority ("FINRA"), residing and doing business in the

State of Washington at all times relevant to this matter.

36.     Ameriprise Financial, Inc. ("Ameriprise") is a licenced securities broker-dealer

and a member firm of FINRA, incorporated in Delaware, headquartered in Minneapolis and

maintaining offices in several states at all times relevant hereto, including Washington, Ohio and

New Jersey, and it has offices in the Trenton District of this Court.

37.     LaCava was registered with Ameriprise at all times relevant to this matter and

Barbee purchased some of his Amira shares at Ameriprise, with LaCava acting as his broker in

those transactions.

## FACTS

### A.     LIABILITY

38.     Barbee began investing in Amira based on LaCava's representations that: (i)

Wacha and LaCava communicated frequently and in detail about the Company and its operations

and finances; (ii) LaCava felt Wacha was very trustworthy; and (iii) LaCava purchased shares of

---

[2]Trading in Amira was briefly halted on the afternoon of August 17, 2020 and the halt
continued into August 18, 2020 (the day that Speck filed the Form 20-F at issue).  Trading never
resumed, the Company was eventually delisted, and investors were never afforded the
opportunity to decide whether to sell, purchase or hold their shares on the NYSE based on (or
with the benefit of having received) the information finally disclosed in the subject Form 20-F.

Amira personally and for a number of his other clients before recommending that Barbee
purchase any shares.

39.     Barbee also made decisions to invest at different times based in part or wholly on:
(i) the representations Wacha made to LaCava about Amira, (ii) the SEC filings made by Amira,
(iii) the "investor presentations" published by Amira (discussed below) and/or (iv) the press
releases issued by Amira.

40.     With knowledge that LaCava had placed a number of his investor clients in
Amira, Wacha made material misrepresentations of material fact to LaCava concerning the value
of the plant and real property on the balance sheet.

41.     For example, Wacha informed LaCava that the plant and real property were
actually worth 300% more than the amount stated on the balance sheet, and that the real book
value of the Company exceeded the amount stated on the balance sheet.

42.     Wacha made material misrepresentations of material fact and/or omitted to state
facts necessary to make other representations of material fact not misleading when commenting
on the Company's short-term debt load.

43.     For example, although the short-term debt amount continued to grow quarter-
over-quarter, Wacha told LaCava that the debt load was less concerning than it appeared, that
Chanana personally guaranteed such debt (which exceeded $200 million), that Chanana was
himself a large lender for Amira and that Chanana would continue to loan funds to Amira on an
as-needed basis.[3]

_____

[3]In reality, Chanana ceased lending funds and sued Amira and/or Amira India prior to
April 1, 2019 in connection with a debt to equity conversion that occurred on or about November
14, 2018, but the existence of this lawsuit was not disclosed to the investing public until after

44.    Moreover, Wacha emphasized and informed LaCava that the growing debt was not only manageable, but it was a deliberate and intentional part of the Company's growth strategy and should not be a cause for concern.

45.    Wacha made material misrepresentations of material fact and/or omitted to state facts necessary to make other representations of material fact not misleading, when addressing questions about the Company's ever growing accounts receivables.

46.    For example, Wacha indicated that an increasing account receivable was common within the industry for growing companies, that receivables were routinely collected in time to service the debt, and regardless, Chanana was able and willing to loan the Company any needed funds (as he had been doing for years) if the receivables were not collected within the expected time frame.[4]

47.    Wacha made material misrepresentations of material fact and/or omitted to state facts necessary to make other material representations not misleading when he informed LaCava that the inventory was actually worth more than reported on the balance sheet, again stating that the Company's real book value was more than stated on the balance sheet.

///

///

_____

Amira had ceased trading on the NYSE in August 2020, despite SEC rules and regulations requiring disclosure of such litigation not later than July 2019 (the prescribed due date for the Form 20-F for the fiscal year), as discussed below.

[4]In reality, creditors forced Amira India into an Indian liquidation proceeding prior to April 1, 2019 and that entity has been insolvent since that time, even though such insolvency was not disclosed to the investing public until after trading in the Company on the NYSE was halted in August 2020.

-9-

48.     According to other litigation filed against Amira, a former CFO of Amira has admitted that Amira has inflated its inventory numbers at times when dealing with bank loan officers.

49.     This same former CFO has allegedly conceded that Amira has at times transferred funds between related entities, affiliates, or entities under the same common control, for the specific purpose of manipulating financial statements.

50.     Pursuant to his employment agreement with the company, Wacha was entitled to equity grants (consisting of stock and options) with a fair value of at least $100,000 each time that Amira hit target "market capitalization" goals, which were set at $1.5 billion, $2.0 billion and then again at $2.5 billion.

51.     Wacha was clearly motivated, and stood to benefit financially, by disseminating information to investors through outside advisors, brokers and registered representatives that would motivate investors to purchase Amira stock and/or induce current holders of the stock to not sell it.

52.     Moreover, Wacha had a financial incentive to omit facts from disclosures that might otherwise nudge an investor to sell or dissuade a potential investor from purchasing.

53.     LaCava (who had an MBA and decades of experience researching companies and representing investors) informed Barbee that he was considering Amira his "stock of the year" based on LaCava's conversations with Wacha and his own review of the SEC filings while Wacha served as CFO.

54.     Barbee made several purchases of shares of Amira based on representations made by Wacha and communicated via LaCava.

-10-

55.     In addition to the tens of thousands of shares purchased at Ameriprise, Barbee purchased at least 43,000 shares (2150 split-adjusted shares)[5] at another broker-dealer, with a cost basis of roughly $440,967.

56.     Barbee incurred and paid tens of thousands of dollars in margin interest in connection with purchasing and/or holding Amira stock over time.

**SEC Filings**

57.     When Amira indirectly held an 80.4% interest in Amira India (through Amira's wholly owned subsidiary Mauritius), Amira India's financials were consolidated into Amira's financials filed with the SEC, including the Forms 20-F for the periods ending March 2017 and March 2018, which each refer to the 19.6% interest in Amira India held by Chanana and unidentified affiliates as the "non-controlling interest."

58.     Some of Amira's SEC filings were late (i.e., they were filed more than four months after the prescribed due date), contain misrepresentations, omit material facts and/or constitute the first disclosure of material facts that should have been disclosed long beforehand, to wit:

**Form 20-F (for the fiscal year ending March 2017)**

59.     Messrs. Chanana and Wacha certified the Form 20-F for the fiscal year ending March 2017 pursuant to §§ 302 and 1350 of the Sarbanes-Oxley Act of 2002.

60.     This SEC filing does not contain financial statements compiled or stated in accordance with Generally Accepted Accounting Principles ("GAAP"), and financial statements

---

[5]The Company stock split 1:20 in December 2019, as part of a plan to stay above the NYSE minimum $1.00 price listing requirements, among other things.

not prepared in compliance with GAAP are presumed misleading, pursuant to SEC Regulation S-X, 17 C.F.R. § 210.4-01.[6]

61.     This filing disclosed an inventory write down of roughly $23,700 occurring within the last three months of this fiscal year and stated that the inventory was worth roughly $273.1 million at the end of the fiscal year (representing an increase in inventory value of roughly $34.1 million from the roughly $239 million in inventory reported at the end of the fiscal year ending March 2016).

62.     On information and belief, the inventory was worth less than the roughly $273.1 million stated at the end of the fiscal year ending March 2017.

63.     On information and belief, Amira should have taken and disclosed a substantially larger inventory write down and/or an inventory impairment during this fiscal year, even when compiling and stating results on a non-GAAP basis.

64.     This filing reports that the total equity between Amira and Amira India at the end of fiscal year March 2017 was roughly $303.2 million ($262.5 million of which was attributable to shareholders of Amira and roughly $40.7 million of which was attributable to the non-controlling interest in Amira India held by Chanana and his affiliates).

65.     This filing materially overstates the equity in Amira and the equity in Amira India attributable to Amira shareholders.

66.     Amira had a disclosed net equity or book value of more than $7.00 at the end of this fiscal year according to the balance sheet in this filing.

_____

[6]None of the financial statements filed with the SEC and discussed herein were compiled or stated in accordance with GAAP, and like the Form 20-F for the fiscal year ending in March 2017, all of them are presumed misleading as well.

67.    However, before this balance sheet was filed with the SEC, Barbee had concerns about the Company's growing debt load, which he communicated to LaCava, and which LaCava communicated to Wacha.

68.    Following conversations with Wacha, and in response to Barbee's concern about the large debt levels, in May 2017 (two months after the close of this fiscal year but still more than two months prior to these results being publicly disclosed) LaCava informed Barbee that Wacha had stated that Amira could sell some of its already undervalued land to pay down some of the rapidly increasing short-term debt, should it need to do so.

69.    In reality, Amira did not receive a license to sell any of the land until some point in 2018, and to date, Amira has not disclosed a sale of any of the land, despite Amira India's insolvency proceeding discussed below.[7]

70.    In July 2017, the earnings for the fiscal year ending March 2017 were filed with the SEC, and LaCava informed Barbee that the revenue reported therein was consistent with the revenue range provided to him several months earlier by Wacha.

71.    The accuracy of the revenue range provided by Wacha months before the earnings were officially released gave Barbee additional reason to trust statements made by Wacha and to believe that Wacha had a contemporaneous and accurate understanding of the financial status of

///

───────────────

[7]Investors are still, almost four years later, waiting for any of the seventeen (17) acres to be monetized, and it appears that all of this property may have been transferred from Amira to Amira India at some point in 2019, a move which caused millions of dollars in investor equity to disappear overnight and which may leave shareholders with no stake in the property or its proceeds if it is later (or has already been) sold as part of Amira India's insolvency proceeding, as discussed in depth below.

-13-

the Company, even months before the financials for the period fiscal year were required to be formally summarized and disclosed in an SEC filing.

**Form 6-K (for the six months ending September 2017)**

72.     Messrs. Wacha and Sethi served as CFOs for the Company at different times covered by this filing, which discloses results of the first half of its fiscal year ending March 2018.

73.     This filing disclosed that inventory had increased to over $306.8 million, which included a write down for inventory during the period of roughly $21.4 thousand and no inventory impairment.

74.     On information and belief, the inventory was worth less than $306.8 million at the end of September 2017.

75.     A larger inventory write down and/or an inventory impairment should have been reported to the public in this filing.

76.     This filing reports that the total equity between Amira and Amira India at the end of the period was roughly $321.9 million ($281.7 million of which was attributable to shareholders of Amira and roughly $40.2 million of which was attributable to the non-controlling interest).

77.     This filing materially overstates the equity in Amira and the equity in Amira India attributable to Amira shareholders.

**Form 6-K (for the period ending December 2017)**

78.     Messrs. Wacha and Sethi served as CFOs for the Company at different times covered by this filing, which occurred in May 2018 and disclosed results of operations covering

the first nine months of the fiscal year ending March 2018 and the three months subsequent to the period covered by the prior Form 6-K filing addressed above and covering operations through September 2017.

79.     This filing reports that inventory had again increased, this time to roughly $343.5 million with only a minor write down of roughly $9,000 and with no inventory impairment.

80.     There is no hint of any significant inventory concerns in this filing, either with respect to the time period covered by this filing or with respect to any prior time period.

81.     However, Amira should have recognized or disclosed a very large inventory impairment and/or inventory write down by the end of the period covered by this Form 6-K.

82.     This filing also discloses an increase in liabilities that was more than offset by an increase in assets, bringing total equity reported in the consolidated financials to $349.9 million (with roughly $306.9 million attributable to shareholders and the balance attributable to the non-controlling interest).

83.     This filing materially overstates the equity in the Amira and the equity in Amira India attributable to Amira shareholders.

84.     This filing also fails to mention a $1.4 million judgment entered against the Company in November 2017 (i.e., during the three months covered by this filing) in favor of the Company's own attorneys, who previously represented the Company in litigation with third parties alleging that the Company falsely inflated revenue and/or misrepresented its financial results or equity position in public disclosures.

///

///

-15-

85.     The law firm/judgment creditor withdrew from prior representation and filed its own action against the Company at some point after conducting its own due diligence into the allegations and/or after discovery in such litigation had begun.

86.     Since this litigation and ultimate judgment were not disclosed to the public until years after the fact, Barbee was not afforded the opportunity to take this litigation into consideration when deciding whether to purchase, sell and/or hold his current position in the Company.

87.     When discussing its operating cash cycle, which would be important to investors when deciding whether to buy, sell or hold stock in the Company, the Company falsely states that it has "paid down the current liabilities."

88.     To the contrary, by the end of the period covered by this filing, current liabilities had increased quarter-over-quarter and year-over-year to its highest point ever while the Company was listed on the NYSE.

89.     When comparing current and non-current debt to prior fiscal periods, this filing falsely states that total current and non-current debt as per International Financial Reporting Standards ("IFRS"), was only $22,440,023 as of the end of March 2017.

90.     In fact, current and non-current debt, even under IFRS, was more than $200.0 million as of the end of March 2017.

91.     This false statement concerning current and non-current debts as per IFRS at the end of March 2017 constitutes a misrepresentation of material fact and violated federal and state securities acts.

///

-16-

**Form NT-20-F (for fiscal year ending March 2018)**

92.    On July 30, 2018, Amira filed a Form NT-20-F to disclose that it would not be filing the Form 20-F for the fiscal year ending March 2018 by the SEC prescribed due date of July 31, 2018.

93.    By June or July 2018, Sethi was aware of the status of any inventory write downs or inventory impairment to be taken during the fiscal year ending March 2018.[8]

94.    When Sethi executed this filing, he knew or should have known that the Company experienced a $134.0 million inventory impairment during and/or before the fiscal year ending March 2018.

95.    This inventory impairment either was or should have been uncovered prior to August 2018, given the Company's own internal controls and inspection requirements, including those required under § 404 of the Sarbanes-Oxley Act of 2002 or otherwise.

96.    Notwithstanding his actual knowledge concerning the Company's results of operations, in this July 2018 filing Sethi stated that he did not anticipate any "significant change in the results of operations from the corresponding period for the last fiscal year."

97.    An inventory impairment of $134.0 million in the fiscal year ending March 2018 was a significant change in the results of operations from the fiscal year ending March 2017 and Sethi knew or had reason to know of this impairment at the time of this Form NT-20-F filing.

98.    This filing also requires a written statement describing any "anticipated" change, both narratively and quantitatively, but Sethi provided no such statement.

---

[8]Just as Wacha had a good idea of the fiscal results for the year ending March 2017 by May 2017 (if not earlier), Sethi also had a good idea of the financial results for the year ending March 2018 within a few months thereafter (and certainly by July 2018).

99.     Although "anticipated" is one term routinely used in the safe harbor provisions in various federal securities statutes and acts, including the PSLRA of 1995, to protect "good faith" beliefs, such term does not fall within the protective provisions when the signatory or certificant has actual or constructive knowledge of facts or a set of facts controverting the truth of the anticipatory statement or when the statement is otherwise not made in "good faith."[9]

100.    If Sethi did not have a factual basis in July 2018 upon which he could reasonably anticipate at such time that there would not be a significant change in results over the prior year, Sethi had a duty to disclose his lack of such factual basis when making any representation in this filing regarding any such comparison between the current and the prior year's operational results.

101.    Sethi's failure to disclose the lack of any factual basis for comparing the results of operations between the years ending March 2018 and March 2017 would lead a reasonable investor to conclude that Sethi had a factual basis for such comparison.

102.    However, Sethi lacked a factual basis for making the specific comparison in this filing between the results of operations for the year ending March 2018 and the year ending March 2017.

103.    Sethi's representations in this filing would lead a reasonable investor to conclude that there would not be any significant change in results of operations for the fiscal period ending in March 2018 from the fiscal period ending March 2017.

///

---

[9]As to the various SEC filings mentioned herein, defendants, and each of them, were aware of the falsity of the subject matter contained in certain "anticipatory" or "forward looking statements" at the time such statements were made, and thus, Amira's "safe harbor" warnings accompanying such forward looking statements were ineffective in shielding these statements (which were not otherwise made in "good faith") from liability accordingly, or for other reasons.

104.    Since there was no material inventory impairment during the fiscal year ending March 2017, and based on Sethi's statement in July 2018 regarding the anticipated results of operations for the fiscal year ending March 2018, it was reasonable for investors to conclude that Amira would not have a significant inventory impairment reported during the fiscal year ending March 2018.

105.    Sethi also anticipated in this filing that "[t]he subject annual report . . . will be filed on or before the fifteenth calendar day following the prescribed due date. . . ."

106.    If Sethi did not have a factual basis to anticipate that the Form 20-F would be filed by the prescribed due date, he should have disclosed his lack of a factual basis for such representation.

107.    Sethi's failure to disclose the lack of any factual basis for making a statement concerning the anticipated filing date would lead a reasonable investor to conclude that Sethi had a factual basis for making such representation concerning the filing date.

108.    However, Sethi had no factual basis when signing this Form NT-20-F to state that the Form 20-F would be filed within fifteen (15) calendar days of the prescribed filing date, and any statement regarding his "anticipation" that it would be filed within such time was not made in good faith.

109.    The subject annual report was made more than seventy-five (75) days after the prescribed due date.

110.    Barbee reasonably relied on the representations within the Form NT-20-F regarding both the timing of the filing of and the content to be contained within the Form 20-F

///

-19-

while waiting for the earnings and results of operations for March 2018 to be reported in the Form 20-F.

111.    Barbee chose to not sell any of his Amira stock while waiting for the Form 20-F based on Sethi's statements (and the lack of any negative statements or information about the current fiscal year's results) in the Form NT-20-F.

112.    Sethi's statements concerning any comparison between the results of the current fiscal year and the prior fiscal year, and the timing of the release of such results, were misleading, misrepresented material facts and omitted to state material facts that would make other representations in the filing not misleading, in violation of federal and state securities acts, among other things.

113.    In short, Sethi should have mentioned the massive inventory impairment in this filing or he should have at least stated that results of operations for the year ending March 2018 would not be similar to the prior year's financial results.

114.    Alternatively, Sethi should have stated in this filing that he lacked any factual basis for making a representation comparing the current year's results to the prior year's results.

115.    Sethi should have stated that he lacked any factual basis for making a representation in this filing as to the anticipated Form 20-F filing date.

**Form 20-F (for the fiscal year ending March 2018)**

116.    Messrs. Chanana and Sethi certified the Form 20-F for the period ending March 2018, pursuant to §§ 302 and 1350 of the Sarbanes-Oxley Act of 2002.[10]

///

---

[10]Wacha also served as the CFO for part of the time covered by this filing.

**A.     Inventory Impairment**

117.    According to this filing, during the last three months of the fiscal year ending March 2018, revenue was roughly $24.1 million but the inventory value declined by roughly $182.2 during the same three months, ending the fiscal year at roughly $161.3 million.

118.    This filing disclosed an inventory write down of roughly $99,500, and an inventory impairment of roughly $134.0 million.

119.    Therefore, excluding the above-mentioned inventory write downs in the Form 20-F and Forms 6-K discussed above, this entire $134.0 million inventory impairment: (i) occurred during the months of January, February and/or March 2018; or (ii) some of this impairment occurred and/or should have been disclosed in one or more the Forms 6-K covering earlier portions of the year ending March 2018 and/or in other SEC filings covering a prior fiscal year or years, including those years ending March 2017 and/or March 2016.

120.    Although this inventory impairment occurred no later than March 2018, it was not mentioned at all in the Form 6-K mentioned above which was filed two months later in May 2018 for the period ending December 2017.

121.    The Company routinely includes statements in its disclosures to update investors on material events occurring between the close of the period addressed in the filing and the date such filing is made with the SEC, but in this case, Amira did not update the investing public on the impairment or even hint at it in the Form 6-K covering the period ending December 2017.[11]

---

[11]Indeed, Note 11 to the financials in such Form 6-K details the material events occurring between the end of the reporting period and the date of such filing in May 2018 that would require disclosure or that could require adjustments to the financials, but inventory was not addressed at all in this note.

122.    In reality, some of the inventory impairment reported in the Form 20-F for March 2018 had actually occurred during or prior to December 2017, and therefore, inventory concerns should have been raised in Note 11 to the Form 6-K for December 2017 as well.

123.    Timely disclosure of the $134.0 million inventory impairment was required promptly after the Company became aware of it, even if such awareness occurred weeks or months prior to the prescribed due date for the next required Form 20-F.

124.    Indeed, the Company had no legal right to delay such disclosure of this inventory impairment until the next Form 20-F prescribed due date.

125.    Notwithstanding the untimely disclosures regarding the inventory impairments, the accurate inventory carrying amount did not decrease by $182.2 million in the months of January, February and March 2018, regardless of whether inventory was carried at the end of December 2017 and/or March 2018 at the lesser of: (i) acquisition cost plus interest attributable to inventory purchases; or (ii) resale value less estimated cost of completion and selling expenses.

126.    To the contrary, assuming the inventory carrying amount decreased by the amount reported, some of this decrease should have been reported in prior Forms 6-K or Forms 20-F for March 2017 and/or March 2016.

127.    In addition, the Company has not disclosed whether it received any insurance proceeds in connection with this inventory impairment and/or write down.[12]

---

[12]An undisclosed amount for product insurance is included in the "Other expense" line of the revenue statement and this filing indicates that the Company insures against several weather and other conditions including fire, earthquake, flood and burglary, not to mention the fact that the Company has allied perils insurance coverage for interruptions at the milling facility.

128.    If the Company received such insurance proceeds and included such amount in reported revenue, the omission of any statement concerning insurance proceeds makes the representations concerning the revenue for the period misleading.

129.    As to the causes of the inventory impairment, this filing attributes the inventory decline primarily to "product deterioration."

130.    Amira's internal controls concerning its inventory impairment detection and reporting process were inadequate, as evidenced in part by the substantial inventory impairment which allegedly occurred in a very short amount of time.

131.    More importantly, Amira failed to provide an accurate assessment of its internal controls and inventory impairment detection and reporting procedures in this filing.

132.    Pursuant to § 404 of the Sarbanes-Oxley Act of 2002, the management of the Company was required to assess and describe in this SEC filing the effectiveness of the Company's internal controls for financial reporting.

133.    The Company failed to adequately assess or disclose the inaccuracies in its internal controls for financial reporting, thereby misrepresenting material facts and omitting to state material facts necessary to make other representations of material fact not misleading, which constitutes a violation of § 404 of the Sarbanes-Oxley Act of 2002 and of federal and/or state securities acts.

134.    Amira also failed to self-report such inaccuracies or flaws in its own assessment of such controls in any of its prior SEC filings.

135.    Amira's failure to adequately and accurately disclose the short-comings in its own internal control and inventory impairment reporting process, as well as Amira's violations of §

404 of the Sarbanes-Oxly Act of 2002, proximately caused or resulted in damages sustained by Barbee.

136.    In addition to product deterioration, the Company also stated that the decline in the inventory carrying amount was impacted by the GST (a tax assessment).

137.    First, the GST tax assessment is only responsible for lowering the inventory carrying amount if inventory is carried at net resale value (which would only happen if the net resale value was less than acquisition cost plus the borrowing costs attributable to such inventory amount).

138.    However, at the time, the Company was carrying inventory based on acquisition and borrowing costs, not based on net resale value.

139.    Indeed, this Form 20-F states that inventory includes borrowing costs.

140.    Second the GST is likely only responsible for a small diminution in the carrying value of inventory, and more importantly, it is misleading and/or deceptive to even mention this tax in this filing as a reason to lower the value of inventory for the subsequent fiscal year after this filing, since the Company reported $0 sales in India (the only country imposing this tax) during fiscal 2019.[13]

141.    The Company knew when making this filing in October 2018 that this GST assessment would not impact inventory for the fiscal year ending in March 2019.

_____

[13]The impairment may have been excessively stated, which may have caused other problems relating to Amira's ultimate insolvency proceedings addressed below, to the extent the GST was applied to inventory to reduce the realizable value, and if: (i) inventory was carried at net realizable value because that amount was less than purchase price plus attributable borrowing costs, (ii) such reductions were carried into 2019, and (iii) no sales in 2019 were subject to such tax.

-24-

142.     Indeed, attributing the inventory value decline to a tax assessed in a country where the Company would not be doing further business is misleading and an omission of material fact necessary to make other representations of material fact not misleading.

143.     In addition to blaming inventory deterioration and the GST tax, this filing partially attributes the decrease in inventory carrying amount to "the large number of warehousing facilities spread across India."

144.     However, only nine such facilities existed by the close of the fiscal year and Amira chose how many to use and where to place them.

145.     In contrast, according to a prior "investor presentation" for the period ending September 2016, which Wacha shared with LaCava, Amira was "Profitable and is Poised for a Return to Growth" in part based on its "increased distribution footprint in India" with new warehouse facilities being put into use (and totaling 15 at the time).

146.     Therefore, Amira did not suggest that 15 warehouse facilities was a large number or would lead to inventory deterioration in September 2016, and no such deterioration occurred at that time (as far as investors know), but in March 2018 the nine warehouses in use (which was actually six fewer warehouses than mentioned in September 2016) had somehow become a "large number" contributing to loss of inventory.

147.     The inconsistent representations regarding the relationship between the number of warehousing facilities and the impact on inventory deterioration reflects a misrepresentation of material facts and/or the omission of material facts necessary to make other representations of material fact not misleading.

///

-25-

148.     The number of facilities used during the fiscal year ending March 2018 did not cause a substantial (or any) portion of the inventory impairment ultimately reported to have occurred between the months of January - March 2018, and the Company's statements to the contrary misrepresent material facts and/or omit to state material facts necessary to make other representations of material fact not misleading.

149.     Not all of the events and causes alleged by the Company to have impacted the decline in the inventory carrying amount described in this filing are disclosed risk factors in the subject Form 20-F or in prior Forms 6-K or 20-F.

**B.     Equity And Lender Concerns**

150.     According to this filing, Amira and Amira India had current assets of $492.3 million (including $161.3 million in inventory, $258.3 million of receivables and $65.9 million in prepayments) and current liabilities of $270.1 million.[14]

151.     Including the $512.8 million of assets and $271.2 million of liabilities disclosed in this filing, shareholders of the Company had $218.7 million in equity in Amira and Amira India, with another $22.9 million attributable to the non-controlling interest in Amira India (held by Chanana and his affiliates).

152.     This filing materially overstates the inventory, receivables and prepayments, as well as the equity in Amira and the equity in Amira India attributable to Amira shareholders, as discussed below or otherwise.

_____

[14]The Company settled a lawsuit with "short sellers" in April 2017 and informed investors later that the settlement amount would be accounted for in fiscal year ending March 2018, but the instant Form 20-F does not provide such accounting, leaving investors to wonder whether Amira was the payor in that settlement.

-26-

153.    An accountant note accompanying the Form 20-F for the year ending March 2018 indicates that "certain of the lenders" have classified some loan balances as "[n]on-performing assets."

154.    Moreover, this action by the lenders caused the accountant to state that continuation as a "going concern" would be dependent on management's plans.

155.    On information and belief, Amira's Audit Committee restricted the content and/or timing of these public accountant's disclosures.[15]

156.    Amira had not previously disclosed that any lender had classified any debt as a non-performing asset or identified any such lenders or the loan balances at issue.

157.    Amira should have timely disclosed the identity of each lender classifying any loan as a non-performing asset and should have timely disclosed the amount of each such loan at issue, especially if Amira India was the borrower on any such loan, and if such classification by any lender occurred at a time when Amira owned a controlling interest in Amira India and consolidated its financials with Amira's financials when making SEC disclosures and filings.

158.    Management commented on this "going concern" language in the accountant's report by stating that "banks have not agreed to reclassify our debt into working capital and real estate" which has resulted in "some of the banks" classifying the loans as non-performing assets,

---

[15]The Audit Committee was made up of Harash Pal Sethi, Mohit Malik and Robert Wagman, each of whom is a current or former Director of Amira and Barbee respectfully reserves the right to make these individuals parties to this action, based on facts to be developed and tested in discovery. Of these three, only Mr. Harash Sethi and Wagman were also members of the Corporate Governance and Nominating Committee, charged with advising the Board as to the Company's compliance with applicable laws and regulations (Malik was not a member of this committee, despite his legal training and education), and Barbee respectfully reserves the right to make these two individuals parties to this action, based on different facts to be developed and tested in discovery.

and further, "management is confident that the going concern assumption has not been impacted."

159.    While "confidence" may not be an actionable term, adequate disclosure of the material facts required identifying each of the lenders reaching such conclusions and disclosing the amount of loans at issue, among other things, and the failure to do so was an omission of material facts necessary to make representations about the Company's going concern status not misleading.

160.    Management refused to disclose these material facts, timely or otherwise, and as we now know (as discussed in great detail below), the lenders' actions later became a substantial concern when they forced Amira India into an involuntary insolvency and liquidation proceeding, only bolstering the conclusion that the above-mentioned omitted facts were material.

161.    Indeed, it remains unclear to this day how many of the lenders have applied for relief in the insolvency proceedings and/or how many of them are parties to any involuntary liquidation proceedings, and it is unclear how much debt is at issue in any or all of these proceedings.

162.    Finally, the Company again failed to disclose the $1.4 million judgment obtained against it by its own counsel in connection with litigation alleging falsification of financials.

163.    In addition to SEC filings, Amira disseminated "investor presentations" covering some of the same time periods addressed by these SEC filings, but some of the material facts in these presentations differed in material ways from the SEC disclosures, to wit:

///

///

-28-

**Investor Presentation (for fiscal year ending March 2018)**

164.     Almost one year after the fiscal year ending March 2018 came to a close, the

Company published an investor presentation covering that year (the "March 2018 Investor

Presentation").

165.     The March 2018 Investor Presentation was attached to an SEC filing and appeared

on Amira's website.[16]

**A.     Deconsolidated Balance Sheets**

166.     Although the Company filed its financials with the SEC on a consolidated basis at

all times since its IPO, the balance sheets in this presentation were arranged on a deconsolidated

basis, with the assets and liabilities of Amira being shown on one balance sheet and the assets

and liabilities of Amira India being shown on a different balance sheet.

167.     The deconsolidation and reorganization between Amira and its largest operating

subsidiary Amira India, did not occur until mid-November 2018, at which time: (i) Amira India

converted debt to stock; (ii) Chanana converted his debt receivable into stock in Amira India;

and/or (iii) Amira and Amira India may have reorganized the assets and liabilities held between

the two companies.[17]

///

---

[16]Wacha and Sethi each served as CFOs for a portion of the fiscal year addressed in this
presentation.

[17]Amira refers loosely to these events as "deconsolidation" sometimes using the term to
reference Chanana's conversion of debt to equity in Amira India, sometimes using the term to
reference Amira India's debt to equity conversion and sometimes using the term to refer to events
related and subsequent to these conversions, including the reorganization of assets and liabilities
between Amira and Amira Inda.

168.     According to a subsequent SEC filing (the Form 20-F for March 2019 discussed below), Amira incurred roughly $179.7 million in expenses in connection with such deconsolidation, which included a write down of roughly $13.7 million in Amira India that Amira was allegedly required to recognize under applicable accounting standards, leaving roughly $166.0 million in actual expenses incurred in connection with deconsolidation.

169.     The Company knew or should have known about these expenses associated with the deconsolidation (or at least a majority of them, including types and amounts) by March 2019 when this presentation was placed on its website.

170.     However, this presentation does not mention this substantial amount of expenses (or that any expenses were incurred to deconsolidate in order present balance sheets on a non-consolidated basis).

171.     By presenting the balance sheet on a deconsolidated basis, knowing that more than $166.0 million in actual expenses were incurred in connection with such deconsolidation, and by omitting to mention that any expenses were incurred with such deconsolidation, the Company intentionally omitted material facts necessary to make representations not misleading.

172.     Even though this presentation is meant to relate to a time when Amira and Amira India were still reporting on a consolidated basis (and had presumably not yet incurred a significant amount of the expenses incurred in connection with such deconsolidation), it is misleading to show balance sheets on a deconsolidated basis without mentioning the expenses to be incurred (which would presumably impact the balance sheet for one or both companies)

///

///

-30-

before the Company would be legally permitted to file financials with the SEC on the deconsolidated basis set forth in these presentations.[18]

173. Moreover, right underneath the heading "Balance Sheet (FYE 3/31/18):" is language that reads "Below breaks out the India subsidiary, which will no longer be consolidated, due to the Company currently owning 49.8%" which suggests that deconsolidation may have actually been effective by March 2018.

174. The above-cited language is misleading to the extent it suggests that the Company owned 49.8% of Amira India on March 31, 2018, and since the presentation does not clarify elsewhere exactly when or how Amira's interest in Amira India went from 80.4% to 49.8%.

175. Moreover, since these balance sheets are not presented on a consolidated basis, the inter-company payables and receivables are included.

176. Specifically, these balance sheets reflect a payable of $56.1 million from Amira India and a receivable of $56.1 million by Amira.

177. As discussed in detail below, at the time this March 2018 Investor Presentation was published or attached to an SEC filing, Amira India had already entered an insolvency and liquidation proceeding (or the Company knew or had reason to know that such insolvency and liquidation proceeding would soon be commended) and the Company was only a few weeks away from closing a fiscal year in which it lost more than $357 million (completely erasing all equity or book value from Amira and Amira India).

_____

[18]Since Amira would own less than a controlling interest in Amira India if the deconsolidation was effective, Amira would no longer be required to include Amira India's liabilities or financials within the disclosures Amira made to the SEC, but as long as Amira retained a controlling interest in Amira India, it was required to report on a consolidated basis, which meant including Amira India's financials within SEC disclosures made to investors.

178.    Indeed, as discussed below, Amira was required to write off $13.7 million from its interest in Amira India as early as mid-November 2018, and thus, it was a misrepresentation of material facts to include receivables from Amira India on these balance sheets in March 2019.

179.    The Company knew or should have known that the $56.1 million in assets listed on Amira's balance sheet as payables from Amira India would not be paid (or that there was very little probability that such would be paid), since the majority of all assets and inventory from both companies was already (or would soon be) delivered to the liquidator and that the Company could not legitimately book these receivables with any real expectation of payment, yet the Company made no mention of this possibility in this presentation.

180.    In fact, there is no mention anywhere in the March 2018 Investor Presentation of the fact that Amira India was insolvent and in liquidation proceedings when this presentation was disseminated for investors or others.

181.    It was misleading to present these balance sheets on a deconsolidated basis without accurately explaining the difference between them and the balance sheets contained in SEC filings covering the same period.

**B.    Inconsistent Statement Of Assets**

182.    The SEC filing for the same period lists $512.8 million of assets, only $1.2 million of which is cash and cash equivalents.

///

///

///

///

-32-

183.    However, this presentation lists $535.6 million of assets between the two

companies, including $22.8 million of cash (which presumably includes $21.6 million in

proceeds from the German subsidiary loan).[19]

184.    It is unclear why any cash from this loan was included in the balance sheet for

2018, or why the amount listed was less than the more than $26 million received. [20]

185.    Even reducing total assets listed in the presentation by the $21.6 million proceeds

from the loan (which would not be available for another year), the presentation still lists total

assets between the two companies of $514.0 million.

186.    If the SEC filing for this period accurately lists total assets, then this presentation

overstates total assets between the two companies, even excluding the $21.6 million of cash

attributable to the future German loan.

### C.    Inconsistent Statement Of Liabilities

187.    The balance sheets in this presentation show $299.7 in total liabilities between the

two companies, which presumably includes a long term liability on Amira's side of $27.4 million

owed to one of Amira's subsidiaries.[21]

---

[19]In March 2019, nearly a year after the date meant to be covered by these balance sheets, Amira obtained a EUR 25 million loan from its German subsidiary.

[20]Although the presentation specifically mentions the EUR 25 million debt inclusion on the balance sheet, it makes no mention of the inclusion of $21.6 million from the loan in the cash shown on Amira's ledger in the presentation, omiting to state that such cash would not be available for another year, and thereby falsely implying that such cash was available to Amira as of the period ending March 2018, which constitutes a misrepresentation of material fact and omits to state material facts necessary to make other representations of material fact in the balance sheets not misleading.

[21]Since the presentation shows $28.5 million in long-term debt, and the SEC filing for the same period shows $1.1 million in long-term debt, the $27.4 million difference could be the

188.    But even excluding this future debt, the presentation still shows $274.7 million of debt between the two companies, which is millions of dollars more than the debt disclosed in the SEC filing covering the same period for these two companies.

189.    Thus, either the SEC filing for this period has understated total liabilities for the two companies by millions of dollars or this presentation has misrepresented the total liabilities.

## D.    Inconsistent Statement of Net Equity

190.    Notwithstanding how the above asset and liability discrepancies impact the net equity calculation, the March 2018 Investor Presentation has substantially and materially different equity calculations than those disclosed in the Form 20-F filing concerning the same fiscal year ending March 2018.

191.    For example, the balance sheet in this presentation indicates that Amira had roughly $42.6 million in net equity and Amira India had roughly $193.3 million of net equity.

192.    Given Amira shareholders' 80.4% interest in Amira India, this means that according to the presentation, the value of Amira shareholders equity in both companies was less than $198.0 million [i.e., $42.6 million + (80.4% of $193.3 million)] and the non-controlling interest in Amira India was worth roughly $37.9 million.[22]

_____

amount booked as the EUR 25.0 million debt to Amira's German subsidiary which was not actually incurred until March 2019, and which is inexplicably $5.8 million more than the cash from such loan included in the assets above, suggesting that Amira had already spent some of the cash it would not receive for another year.

[22]Assuming deconsolidation occurred on the time line presented by the Company, Amira shareholders actually had a 49.8% interest in Amira India at the time this March 2018 Investor Presentation was made public (meaning Amira shareholders had become the minority and non-controlling interest in Amira India), and their equity interest in Amira India had decreased to less than $97 million, which would bring their total equity in both companies to less than $139.0 million [i.e., $42.6 million + (49.8% of $193.3 million)].

-34-

193. As discussed above, the SEC filing covering the same time period states that equity available to Amira shareholders in both companies was roughly $218.7, and the non-controlling interest in Amira India was valued at roughly $22.9 million.

194. If the balance sheets for Amira and Amira India in the March 2018 Investor Presentation are accurate, then the SEC filing covering the same period falsely understated the equity attributable to the non-controlling interest by millions of dollars and overstated the equity available to Amira shareholders by millions of dollars.

195. Moreover, if the March 2018 Investor Presentation (which was published and filed with the SEC several months after the Form 20-F covering the same period was filed) presents an accurate balance sheet for Amira and Amira India as of March 2018, then the SEC overstated the combined equity in both companies by several million dollars.

196. Excluding the $56.1 million "investment in uncons." entries on the Amira and Amira India balance sheets for receivables and payables (which the Company knew or should have known were misleading when this SEC filing occurred) the equity attributable to Amira would have actually been negative $13.4 million and Amira India would have actually been $249.4 million in equity (raising the value of the non-controlling interest to over $48.8 million while further decreasing the equity available to Amira shareholders).

197. Amira did not timely disclose or explain in this presentation (or before releasing its final Form 20-F, after trading on the NYSE had ceased) that its balance sheet would show negative equity if Amira was unable to book payables from Amira India as assets, among other things.

///

-35-

198.     Amira's potential negative equity would be important to a reasonable investor and by omitting this fact, Amira caused other representations regarding investors' stake in Amira to be misleading.

199.     The ratio of current assets to current liabilities was also important when calculating net equity, because if the ratio of current assets to current liabilities fell below 1.33, then various obligations to the lender would have been triggered, pursuant to covenants within the lending documents, among other things.

200.     The ratio of current assets to current debts fell below 1.33 on more than one occasion between July 1, 2017 and March 2019, yet Amira did not timely disclose this fact to its investors.

201.     When comparing the March Investor Presentation with the SEC Form 20-F covering the same period, it is apparent that the balance sheets presented therein are inconsistent and cannot both be correct; the balance sheets in one or both of these documents contain misrepresentations of material fact and omit to state material facts necessary to make other representations of material fact not misleading.

**E.     Misleading Projections**

202.     The above balance sheet issues pale in comparison to the misleading revenue and deceptive projections contained near the end of this March 2018 Investor Presentation.

203.     First, although this hypothetical projection is apparently meant to skip over 2019 results and only address the fiscal year ending March 2020, the Company has labeled such year

///

///

-36-

as "2019" which is inconsistent with the Company's prior course of conduct and practice and therefore misleading, since the nomenclature departure is not clearing explained.[23]

204.    On information and belief, Amira did not provide any projections for the fiscal year ending March 2019 (and instead labeled its projections for March 2020 as "2019") because it was hoping that investors would mistake the projections in this presentation for 2019 projections, and that by disclosing actual 2019 projections (which should have been subject to a fairly accurate calculation at the time, since the 2019 year was almost over when this presentation came out), Amira might effectively correct the error it was hoping investors would make.

205.    Second, this presentation illustrates a future P/E ratio of 7.6 (on a $1.12 share value) and a future 4.5 ratio of enterprise value over EBITDA, but the Company had no factual basis for these projections when made and the Company failed to disclose its lack of any factual basis for making them.

206.    In fact, when this presentation was made public, the Company was only two weeks away from closing its worst fiscal year as a publicly traded company (or perhaps ever, in its 100+ history); a year which saw a nearly $7.50 loss per share (i.e., a negative P/E ratio) and which left the shareholders with negative equity in Amira and in Amira India.

**F.    Misrepresentations Regarding Funding From Chanana**

207.    This presentation states that Chanana "has continued to make investments in the Company since the IPO."

_____

[23]It is the Company's stated practice in all SEC filings (as described by the Company itself when explaining conventions it uses in such filings), that when referring to a "fiscal" year, the Company means the fiscal year ending on March 31 of that year, whereas when referring to a year other than a fiscal year, the Company means the calendar year ending on December 31.

208.    At the time this presentation was disseminated to the public, Chanana had ceased lending funds and was involved in litigation against Amira and/or Amira India in connection with a loan to equity conversion exceeding $16.3 million, as discussed below.

209.    While Amira may claim that the statement about Chanana loaning funds was accurate as of March 2018, the date covered by this presentation, this presentation also states that the "[b]elow breaks out the Indian subsidiary, which will no longer be consolidated, due to the Company currently owing 49.8%" referring to the current status of the holdings at the time of publication (not the time frame covered by the presentation), and such statement occurred right next to the statement concerning Chanana's lending to the companies.

210.    If the Company meant to indicate that Chanana was lending to the companies as of March 2018, but not through the present, it omitted to state facts necessary to make such representation of material fact not misleading.

211.    The Company knew or should have known on the date that this presentation was attached to an SEC filing that the financial and operational state of the entities was materially different than suggested in this presentation (or it should have known that the Form 20-F covering the same time period included false and misleading material statements of fact).

212.    The SEC filing for March 2018 and/or the March 2018 Investor Presentation contain misrepresentations of material facts and omit material facts in violation of securities acts, and these misrepresentations and omissions were part of a scheme to induce investors to not sell their shares of Amira, which would have caused Chanana to suffer millions of dollars of losses in his own investments in Amira and in Amira India, among other things.

///

-38-

213. Unaware of the disastrous financial results for March 2019 (and the lack of any factual basis supporting the "2019" projections), Barbee found the balance sheets and projections in this March 2018 Investor Presentation to be very compelling reasons for holding the Company shares and continuing to add to his position when possible.

**Form 6-K (six month period ending September 2018)**

214. Amira filed the Form 6-K for the period ending September 2018 in April 2019.

**A.     Omitting Facts Regarding Lender Concerns Or Insolvency**

215. Although this filing was meant to cover the first half of the fiscal year ending March 2019, it failed to disclose any pending or prior insolvency proceedings or pending or threatened lawsuits by any lender(s) under any insolvency or bankruptcy code.

216. On information and belief, Amira and/or Amira India were notified of and/or were involved in liquidation proceedings (or such proceedings were threatened by one of more of their creditors) by September 2018, pursuant to Indian bankruptcy laws or otherwise.

217. Moreover, even if not yet commenced or threatened, the material facts existing as of September 2018 concerning the status of any liquidation proceeding involving Amira and/or Amira India (or that would have triggered a future liquidation proceeding, such as a breach of the 1.33 ratio or otherwise), should have been disclosed to Amira investors in this Form 6-K, and the signatory was aware (or should have been aware) of such facts by the time this filing occurred.

218. This filing does not mention the litigation between Chanana and Amira and/or Amira India that was commenced after the date covered by this period but prior to the Form 20-F filing date in Note 11 or elsewhere, which constitutes the omission of a material fact necessary to make other representations of material fact not misleading.

**B.**     **Loss Characterized As A Gain**

219.     As to results of operations, the Company reported a loss for the period of roughly $47.9 million, with roughly $7.0 million of those being attributed to non-controlling interest.

220.     The filing lists $62.1 million of "Other expenses", which brought the period from a profitable one into losing territory, but these expenses are not detailed or described with any level of specificity.

221.     This vague disclosure of "other expenses" does not list or itemize such expenses and omits facts necessary to make other representations of material fact in this filing not misleading.

222.     If any of these $62.1 million of "Other expenses" were incurred in connection with the deconsolidation, then such facts should have been disclosed and the expenses identified with more specificity (such as by type and amount).

223.     Notwithstanding the Company's actual loss for the period, the Company used IFRS 9 to characterize the situation as a gain in this filing, by including an add-back in the reconciliation of earnings for the Expected Credit Loss of $52.9 million, which replaces the "incurred loss" model and is only permissible using the IFRS 9.

224.     However, additional disclosure requirements exist when using this reporting standard instead of the incurred loss model.

225.     The Company did not comply with these additional disclosure requirements.

226.     Even if the Company had complied with the additional disclosure requirements, the use of this add-back reflects an adoption of this international financial reporting standard at a time when the Company was simultaneously reviewing how to adopt this standard.

-40-

227.    Specifically, the Company states that "[w]e are in the process of determining the method of adoption and assessing the impact of IFRS 9 on our consolidated results of operations, cash flows, financial position and disclosures."

228.    On the date that this filing was approved by the Board of Directors, it was already known that the Company would no longer be filing consolidated statements, and the reference to consolidated filings not only omits to state this determination by management but also misleads the reader by suggesting that there was any reason for determining the impact of using this accounting standard on consolidated financial results.[24]

229.    The Company's attempt to report a massive loss as a gain, based on certain reporting standards with which it did not fully comply (and when it was simultaneously trying to decide how to adopt such standards), constitutes a scheme to defraud and is consistent with the Company's attempt to induce shareholders including Barbee to not sell shares.

C.    **Assets Are Overstated And Liabilities Are Understated**

230.    This filing discloses current assets of roughly $405.0 million (including $115.0 in inventory and $216.2 million in receivables, among other categories) and $223.1 million in current liabilities (including $206.8 million in debt, $14.7 million of which was owed to Mr. Chanana and affiliates).[25]

231.    This filing overstated the carrying amount for inventory and/or receivables.

---

[24]Barbee respectfully reserves the right to add individuals sitting on the Board of Directors at times relevant to this particular filing, including those formally approving it, as parties to this proceeding, pending facts to be developed and tested in discovery.

[25]This is roughly equal to a 1.82 ratio of current assets to current debts, assuming that the inventory and receivables have not been overstated.

232.    Including non-current assets, total assets were roughly $423.9 million (including $6.4 million of cash and cash equivalents) and including non-current debt, total debt was $229.2 million, yielding net equity of $194.7 million (with $179.0 million attributable to Amira shareholders and another $15.7 million of equity attributable to the non-controlling interest).

233.    The balance sheet does not disclose all of Amira's liabilities and/or all of Amira India's liabilities.

234.    As only one example, Amira also failed again to disclose the $1.4 million judgment entered against the Company in November 2017 in favor of the Company's own attorneys.

**Investor Presentation (for six month period ending September 2018)**

235.    Amira published another investor presentation in May 2019, weeks after the Form 6-K for the period ending September 2018 had been filed, and after the close of the fiscal year in which Amira lost over $357 million dollars, the consolidated balance sheet for both companies had turned negative, Amira India was insolvent and in liquidation proceedings, and Chanana was litigating with Amira and/or Amira India concerning a prior debt to equity conversion.

236.    This presentation addressed the period ending September 2018 (the "September 2018 Investor Presentation"), and did not disclose or even mention any of the above-mentioned losses, negative equity, insolvency or litigation issues.

237.    Instead, once again, this presentation contained substantially different material numbers than those contained in the SEC filing covering the same period.

238.    This presentation, like the one for May 2018, appeared on Amira's website and was also attached to an SEC filing.

-42-

**A.      Deconsolidated Balance Sheets**

239.     Even though the Company was still filing on a consolidated basis as of September 2018, balance sheets for Amira and Amira India are once again presented on a deconsolidated basis and wholly ignore the roughly $166.0 million in expenses incurred primarily in connection with such deconsolidation.

240.     If any of the more than $62.1 million of "Other expenses" listed in the Form 6-K for this period relate to the deconsolidation effort, Amira omitted to state these facts making other representations in this presentation regarding the reorganization of these companies misleading.

241.     Since deconsolidation was finalized sometime in November 2018, Amira knew or should have been painfully aware of the massive expenses incurred in connection with the deconsolidation by May 2019 when this presentation came out and intentionally omitted to disclose material facts concerning these expenses.[26]

242.     And although this presentation reduces Amira India's inter-company payable to Amira to $38.4 million, Amira was not entitled to book these assets at this time since the insolvency proceeding had been commenced months before this presentation was placed on Amira's website (or Amira had reason to know it would soon be commenced) and Amira otherwise had no reasonable expectation of payment of these receivables.

///

---

[26]Although the balance sheets in the March 2018 Investor Presentation seemed to lack any foundation, there is even less justification for the balance sheets in this subsequent presentation, since the Company had actual knowledge by the time that Amira India was insolvent and internal litigation was occurring (which jeopardized the equity conversion that this presentation presumes will not be reversed).

243. Granted, this presentation is meant to relate back to September 2018, but Amira omitted material facts regarding the status of the threatened or commenced insolvency proceedings (which may have been threatened or commenced by September 2018 and which were certainly commenced by the time this presentation was put on Amira's website), which made representations regarding this receivable from Amira India misleading, among other things.

244. Including this payable in this presentation constitutes a misrepresentation of material fact.

**B.    Inconsistent Statement Of Assets**

245. The balance sheets in this presentation include 29.3 million of cash between the two entities ($22.9 million more than the $6.4 million of cash and cash equivalents stated in the SEC filing for the same period).

246. Presumably this additional $22.9 million of cash is from the German loan (none of which had been received by September 2018), but Amira again did not expressly state whether this $22.9 million of cash was from the EUR 25 million German loan or explain how that any such amount could ever exceed the $21.6 million of cash from the loan included in the prior investor presentation.

247. However, this presentation did specifically mention that the balance sheet contained the EUR 25.0 million debt, although no such amount was owing as of September 2018, and both the inclusion of the remaining cash and liability on the balance sheet covering this time period constitute a misrepresentation of material facts and the omission of material facts necessary to make other representations of material fact not misleading.

///

-44-

248.    Indeed, Amira selectively included assets on the balance sheet for both the March

2018 and September 2018 Investor Presentations which were not held by the Company during

the period covered by such presentation (such as the cash from the German subsidiary loan),

presumably because the Company had obtained such cash by the time such presentation was

released, but Amira also selectively excluded any mention or description of substantial expenses

incurred by the time either or both of the presentations were released (such as the expenses

incurred in connection with the deconsolidation), presumably on the ground that such expenses

had not yet been incurred during the time frame the presentation is meant to cover.

249.    Amira selectively included certain assets and excluded certain liabilities on the

balance sheets in an inconsistent fashion and did so as part as a scheme to defraud investors and

induce them to continue holding and to not sell their shares in the Company.

250.    Amira misrepresented and omitted to state material facts necessary to make other

representations of material fact not misleading when it selectively included certain assets and

excluded the mention of certain liabilities in the March 2018 and September 2018 Investor

Presentations.

251.    Barbee reasonably relied on Amira's intentional or negligent misrepresentations

of material facts in these presentations to his detriment.

## C.    Inconsistent Statement Of Net Equity

252.    As to equity, this presentation states that Amira India's net equity as of September

2018 was $54.5 million, implying that the non-controlling equity interest of Amira shareholders

in Amira India would be worth roughly $10.7 million (i.e., 19.6% of $54.5 million).

///

253.    If the equity attributable to the non-controlling interest was $15.7 million, as stated in the SEC filing covering this period, then the investor presentation for this period has understated the value of the non-controlling interest in Amira India by roughly $5.0 million.

254.    Although the Company may try to reconcile these different values by pointing to the $5.7 million less in combined equity in both companies in this presentation (roughly $189.0 million) as compared to the combined equity in both companies stated in the SEC filing (roughly $194.7 million), any such explanation would be false and misleading, because the lower combined equity in the September 2018 Investor Presentation is based on the additional $22.9 million in cash from the German loan, less then $28.3 million in long-term debt presumably attributable to such loan, and both entries are on the Amira side of the balance sheet, which would not impact Amira India's net equity.[27]

255.    With the $38.4 million uncollectible receivable from Amira India removed from the balance sheets, the total net equity in Amira would be $96.1 million and Amira India's total net equity would be $92.9 million, bringing Amira shareholders' total net equity in the companies to $170.8 million [i.e., $96.1 million + (80.4% of 92.9 million)].

256.    If the $38.4 million payable from Amira India to Amira is not removed from Amira India's balance sheet, then the ratio of Amira India's current assets to current debts was less than 1.33 as of September 2018, according to this presentation, and Amira should have disclosed to investors that certain debt covenants and certain obligations to lenders may have been triggered by this ratio, among other things, but Amira failed to do so.

---

[27]This presentation states that Amira has $34.4 million of long-term debt, compared to the $6.1 million of long-term debt listed in the SEC filing for the same period, with the difference presumably being the outstanding balance on the German subsidiary loan.

257.     When excluding the cash and debt on the Amira balance sheet from the German loan, this presentation implies that shareholder equity in Amira and Amira India exceeds $179.0 million (assuming Amira still held an 80.4% interest in Amira India at the end of the period).

258.     Either the SEC filing covering this time period or this presentation (and possibly both) overstated total net equity available to Amira shareholders.

### D.     Misleading Projections

259.     Repeating what was apparently not questioned the first time, this presentation again deceptively uses "2019" to mean fiscal year 2020.

260.     And there was no basis for such projections which brazenly *increased* to a 10.0 P/E ratio from the 7.6 P/E ratio used in the March 2018 Investor Presentation.

261.     To the contrary, Amira made these projections having the additional benefit of months of data since the last investor presentation came out to realize that such presentations lacked any factual basis.

262.     Giving Amira the benefit of the doubt, and assuming for a minute that in May 2019 when it published this presentation that it somehow lacked such actual knowledge of its financial position as of September 2018 (which it did not), it was grossly or intentionally reckless to posit such misleading and deceptive projections at all, which is actionable under state and federal securities laws and in tort.

### E.     Misrepresentations Regarding Funding From Chanana

263.     This presentation again states that Chanana has continued to invest in the Company since the IPO, even though he was litigating a debt to equity conversion when this presentation was released and this presentation selectively does not mention such litigation.

-47-

264.    When comparing this presentation with the SEC filing covering the same period, Amira misrepresents material facts and/or omits material facts in one or both of these disclosures necessary to make the representations made in such disclosures not misleading, and Amira did so to induce investors, such as Barbee, to not sell their shares.

**Form NT-20-F (for fiscal year ending March 2019)**

265.    In late July 2019 when Chanana signed this filing, he had no reasonable belief that the Form 20-F for the fiscal year ending March 2019 would be filed within fifteen (15) days of the prescribed date or even in August 2019.

266.    Yet, he stated that it would be filed within fifteen (15) days of the prescribed due date and he made no attempt to qualify this statement by saying he "anticipates" the filing will occur within such time.

267.    The Form 20-F for March 2019 was filed more than one year after this NT-20-F filing.

268.    When giving investors an idea of what to expect in the earnings report (which would be important to a reasonable investor, since the report was already going to be late), Chanana states that he did not "anticipate" a significant change in operations from the corresponding period, yet as discussed below, when Mr. Chanana signed this filing: (i) the Company's annual revenue had fallen from $413.9 million in the fiscal year ending March 2018 to just $64.4 million for the fiscal year ending March 2019; (ii) inventory had fallen to $1.2 million, after management took another $2.8 million write down for the Company's failure to properly fumigate the inventory; (iii) the Company had just finished a fiscal year in which it experienced a loss of more than $357 million, which erased all Amira investor equity from the

balance sheet; (iv) Amira India was already involved in the insolvency proceedings; (v) Amira and Amira India were no longer reporting financials on a consolidated basis; and (vi) Chanana himself was in litigation against Amira and/or Amira India concerning a debt conversion, the outcome of which might require Amira to revert to consolidated filings.

269.    These facts had not been previously disclosed and would be kept secret from investors for another year after this filing and would not become public knowledge until August 2020 (one day after the NYSE halted trading in the Company and delisting proceedings were commenced).[28]

270.    Chanana omitted to disclose any or all of the above-mentioned material facts and circumstances in this filing (or at any time within the next year) in an effort to induce shareholders to continue holding and to not sell their shares.

271.    Unaware of any of these material facts, Barbee held on to his shares, reasonably relying on Chanana's statement to the effect that results of operations for March 2019 would not be significantly different than results for March 2018, and Barbee ended up waiting more than one year for the filing which should have been filed much earlier.

272.    As to Amira's failure to file this Form 20-F by the end of July 2019, this filing states that the Company could not comply with the NYSE filing deadlines without "unreasonable effort and expense to the Company" based upon the "corporate organization restructuring that occurred as a result of the de-consolidation of the Indian subsidiary as of November 18, 2018."

---

[28]Language on this document (immediately next to Chanana's signature) states that a misstatement of material fact in this form constitutes a federal crime, citing 18 U.S.C. 1001. Investors reasonably rely on the representations in these documents, especially given the penalties for making a misstatement of material fact in them.

273.    Since Amira chose to deconsolidate and reorganize, and engineered the events that it later blamed for a delay in the Form 20-F filing, the effort and expense necessary to comply with the NYSE filing rules would have been reasonable.

274.    Any effort or expense necessary to comply with the NYSE filing deadlines would have been reasonable, given the roughly $166.0 million Amira chose to spend in connection with the deconsolidation process.

275.    Although deconsolidation and/or reorganization may have made accounting more difficult, these events did not prevent the Company from timely disclosure.

276.    The company could have met the SEC filing deadlines by spending additional sums.

277.    Amira had the funds necessary to timely comply with filing rules and deadlines with respect to the Form 20-F for the fiscal year ending March 2019.

278.    Informing investors, including Barbee, that the expenses necessary to accomplish a filing in compliance with SEC deadlines would have been "unreasonable" is misleading, misrepresents material facts and omits material facts necessary to make other representations not misleading.

279.    In reality, the Form 20-F filing was delayed because the Company: (i) was trying to buy time to resolve Amira India's insolvency proceeding and/or the internal litigation regarding the loan to equity conversion, the outcome of which could cause Amira India to not be deemed an Associate (which would then require Amira to report results on a consolidated basis); (ii) did not want to incur the expense or expend the effort needed to file the annual reports within four months after the close of the fiscal year; and (iii) wanted to delay disclosing facts that may

cause a reasonable investor to sell and/or dissuade other potential investors from purchasing shares.[29]

280.    Moreover, as discussed below, when Chanana signed this filing, he and Amira India and some of its directors had already been accused of criminal conspiracy to commit fraud, stock manipulation and misappropriation of funds by the Central Bureau of Investigation of India, which had conducted searches in eight different locations and also performed a forensic audit of Amira India's accounts in March 2019, and Amira wanted to suppress disclosure of these charges as long as possible, which further delayed the Form 20-F filing.[30]

**Form 6-K (August 2019 SEC letter)**

281.    In August 2019, the SEC informed the Company in writing that it would cease to be traded on the NYSE and would subsequently be delisted if it did not file by August 16, 2020 the Forms 20-F for the periods ending March 2019 and March 2020, plus the Form 6-K for the period ending September 2019.

282.    Instead of disclosing the material facts set forth in the SEC's letter, on or about August 23, 2019, the Company described such letter in a Form 6-K filing as a notice that the Company: (i) was not in compliance with § 802.01E of the NYSE Listed Company Manual (the

---

[29]If required to continue reporting on a consolidated basis, Amira's primary purpose for the deconsolidation/reorganization (i.e., to avoid any ongoing reporting requirements to shareholders and others, including Amira India's lenders, concerning the status of Amira India's assets, liabilities and/or pending or threatened litigation), would have been compromised or defeated.

[30]To date, neither Chanana nor Amira India nor any of the other individuals accused of wrongdoing by this Indian agency have ever disclosed the existence of the audit, the searches or the charges to public investors in the United States, nor have they denied any such charges in any SEC filing or press release in the United States.

"NYSE Manual"), since it did not timely file the Form 20-F for the period ending March 2019;
and it (ii) had also violated § section 302 of the NYSE Manual by not promptly holding a
shareholder meeting around the time the Form 20-F was due.

283.    The Company also stating that it could come back into compliance with the
subject listing requirements mentioned in the SEC letter by filing the Form 20-F for March 2019
by February 16, 2020 and by holding its annual shareholder meeting as soon as practical
thereafter.

284.    The Company issued a press release containing a substantially similar disclosure
around the same time of its SEC filing.

285.    The Company did not mention the Form 6-K for September 2019 or the Form 20-
F for March 2020 and said absolutely nothing about the significance of the August 16,
2020 date in: (i) this Form 6-K; (ii) the above-mentioned press release; or (iii) in any subsequent
SEC filing or press release prior to the trading halt on August 17, 2020, and since trading in the
Company never resumed on the NYSE thereafter, Barbee was deprived of the opportunity to
consider the substance of the SEC's notice when deciding whether to buy, sell or hold shares of
Amira on this liquid exchange.

286.    In short, the Company misrepresented the contents of the SEC letter and the
related significance to Amira's continued listing on the NYSE in SEC filings and press releases,
and omitted to add clarifying statements at any time prior to the trading halt that would have
made the representations actually made not misleading, and it did do in violation of state and
federal securities laws and to induce investors not to sell their shares.

///

-52-

287.    As the CFO of the Company at the time this letter was received, Speck had a duty to accurately and timely disclose the contents of this letter to the public (if not at a later date).

288.    Speck breached this duty of disclosure, proximately causing damages to Barbee in an amount according to proof at hearing or trial.

289.    Other defendants had similar duties of disclosure and similarly breached them, proximately causing damages to Barbee.

290.    Indeed, Barbee was purchasing and/or holding shares in the Company for an entire year after this Form 6-K came out, having no idea that it mischaracterized the substance of the SEC letter or that a delisting date was rapidly approaching (or even that a date certain for such potential delisting was previously known by or disclosed to the Company by the SEC).[31]

**Form NT-20-F (for fiscal year ending March 2020)**

291.    When signing this form on August 10, 2020, Speck knew with certainty that the Form 20-F for the fiscal year ending March 2020 would not be filed within five (5) days [i.e., within fifteen (15) days of the prescribed due date of July 31, 2020].

292.    In fact, the Company did not even begin work on the Form 20-F for March 2020 until August 18, 2020 at the earliest, or if any such work had begun, the Company was not close to completing the Form 20-F by August 18, 2020.[32]

_____

[31]The share price has fallen roughly 80% since the Company initially received the August 2019 SEC letter giving one year's advance notice of the deadline within which to complete the conditions precedent to avoid delisting.

[32]Speck directly informed Barbee's broker in writing on August 19, 2020, four (4) days after the fifteen (15) day filing date extension had expired, that the Company had just finished the Form 20-F for the prior year, and that the Company (using the future tense) was now going to work on the Form 20-F that was already overdue: "[y]esterday we filed the Form 20F and we are going to roll into the Form 20F for 3/31/20."

-53-

293.     Speck's statement about whether the Company would file the Form 20-F for
March 2020 within fifteen (15) days of the prescribed due date is misleading, misrepresents
material facts and omits material facts, since it includes "best efforts" language but also states
that various SEC forms "will be" filed within fifteen (15) calendar days following the prescribed
due date.

294.     Simply put, Speck knew with absolute certainty when signing this filing that the
Form 20-F for March 2020 would not be filed within fifteen (15) days of the prescribed due date,
since the Company had not even finished the prior year's filing or really begun work on the one
currently due, but Speck nevertheless signed this confusing and poorly worded filing that did not
clearly state or disclose that the subject annual report would not be filed by August 15, 2020.

295.     The Company chose ambiguous language regarding the subject Form 20-F filing
date to induce investors to continue holding their shares and to not sell, which may have been
likely had the Company disclosed that work on the Form 20-F had not yet even really begun as of
August 10, 2020.

296.     In addition, Speck certainly had no reasonable belief on August 10, 2020 when he
signed this form that the Form 20-F for the fiscal years ending in March 2019 and March 2020
and the Form 6-K for September 2019 would be filed prior to the SEC's previously announced
August 16, 2020 deadline.

297.     Indeed, to date, more than nine months after Speck signed this filing, the
Company still has not filed the Form 6-K for September 2019 or the Form 20-F for March 2020.

298.     However, Speck chose not to say anything about the rapidly approaching SEC
deadline concerning delisting proceedings when making this filing or at any other time.

299.    The omission of material facts concerning the SEC's deadline violates state and federal laws, and is actionable in tort, as discussed below.

300.    As to what investors may reasonably expect to see in the fiscal results for March 2020, Speck stated that he did not anticipate a "significant change in the results of operations from the corresponding period for the last fiscal year."[33]

301.    This statement is wholly meaningless to the investing public, since the results of operations from the prior year had still not yet been filed or disclosed.[34]

302.    On one hand, if the results for March 2019 and March 2020 had been completely (or even completed in large part) by August 10, 2020 when Speck made this statement, they should have been filed and disclosed to the investing public no later than August 15, 2020, and the failure to do so constitutes the omission of and failure to timely disclose material facts.

303.    On the other hand, if the results from the March 2019 and March 2020 had not been sufficiently completed by this time to afford Speck the basis for any comparison, Speck's statement comparing the two fiscal years is misleading or omits to state facts necessary to make the representation regarding a comparison between the two fiscal years not misleading.

---

[33]If Speck was aware of the results of operations for years ending in March 2020 and March 2019 on August 10, 2020, and to the extent there were significant changes in results of operations between the two years, any typical safe harbor language that would otherwise apply to statements of "anticipation" or statements deemed "anticipatory" in nature would not shield his statements and conduct from scrutiny under federal or state securities acts, as they would not have been made in "good faith,"

[34]Had the Company timely complied with listing requirements and SEC rules, the Form NT-20-F for the fiscal year ending March 2020 would not be filed prior to the Form 20-F for the fiscal year ending March 2019, and the failure to file these forms in their intended chronological order frustrates one intended purpose of these filings, which is to provide an expectation of results of operations for the current fiscal year based on a comparison to the prior fiscal year's results, which in this case, had not yet been filed.

-55-

304.    On information and belief (since the Form 20-F for March 2020 may never be filed), there was a significant change in the results of the operations for the fiscal year ending in March 2020 from the fiscal year ending in March 2019.

305.    Speck's statement comparing the March 2020 results of operations to results of operations for March 2019 contains misrepresentations of material fact and omits facts necessary to make other representations of material fact not misleading.

306.    Moreover, Speck lacked any factual basis for making a comparison to March 2020 results and March 2019 results on August 10, 2020 and he failed to disclose the lack of such factual basis, thereby omitting to state material facts necessary to make other representations not misleading.

307.    The statement in this filing to the effect that the Company could not have timely filed the Form 20-F for March 2020 without incurring "unreasonable" expense or effort, along with the general reference to COVID, misrepresents material facts, omits to state material facts necessary to make other representations of material fact not misleading and mischaracterizes the causes and reasons for the Company not timely filing results.

308.    First, certain events impacting the delay for this filing occurred in 2018 and 2019 in connection with the deconsolidation (long before the world's case of COVID-19) and the pandemic had nothing to do with the delays associated with the Form 20-F for March 2019.

309.    Had the Company timely filed its Form 20-F for March 2019, any delays caused by COVID-19 would not have prevented the Company from filing its Form 20-F for March 2020 by the prescribed date or within the additional fifteen (15) day extension granted by the SEC and NYSE rules.

310.     Although deconsolidation and reorganization may have made accounting more difficult, time consuming and expensive, the Company could have met the SEC filing deadlines (of which it was well aware when voluntarily deciding to reorganize and deconsolidate), by spending additional time and money to do so.

311.     Amira had the funds (or had access to such funds) and could expend the additional effort necessary, if any, to file the Form 20-F for March 2020 timely or within the fifteen (15) day extension.

312.     The Company did not timely file the Forms 20-F for March 2019 or March 2020 because it did not want to incur the additional expense or expend the effort needed to comply with the SEC filing deadlines.

313.     The Company did not timely file the Forms 20-F for March 2019 or March 2020 because it wished to delay or avoid disclosure of Amira India's insolvency, the internal litigation between Chanana and Amira India and/or Amira and the criminal charges of fraud and stock manipulation against Chanana and others, all as part of a scheme to induce shareholders to not sell their shares.

**Form 20-F (for fiscal year ending March 2019)**

314.     On August 18, 2020, the first day after trading in Amira was halted on the NYSE, the public was informed by non-Amira agents or principals that delisting proceedings would begin immediately for the Company.

315.     The same day, Amira finally filed its Form 20-F for the period ending roughly eighteen (18) months earlier, although it could have done so on or before August 14, 2020 while the Company was still trading on the NYSE.

-57-

316.     With the knowledge that Amira would be halted and the delisting procedure would begin on or soon after the SEC's previously advised deadline of August 16, 2020 (a Sunday), Amira intentionally timed the filing of this Form 20-F so that investors would not be able to sell their shares on the NYSE in reaction or response to the content contained in such filing.[35]

317.     This Form 20-F, which was certified individually by Messrs. Chanana and Speck pursuant to § 302 of the Sarbanes-Oxley Act of 2002 and certified jointly by them under § 1350 of that Act, contains: (i) a number of untimely disclosures of material fact; (ii) misrepresentations of material facts; and (iii) omits facts necessary to make other representations of material fact not misleading.

318.     This is the third annual fiscal report certified by as many different CFOs, although Speck has apparently chosen to remain with the Company and not resign.[36]

319.     As alleged below, Amira failed to timely and/or adequately disclose: (i) the content of the SEC's August 2019 letter, or that by March 2019; (ii) Chanana was in litigation with Amira and/or Amira India concerning a debt to equity share conversion; (iii) Amira India was actually insolvent (and was already involved in an Indian liquidator proceeding); (iii) the law firm representing Amira in connection with litigation alleging that Amira manipulated its

---

[35] The delay in filing this annual disclosure, coupled with the prior Form NT-20-F filing indicating that such year's operating and fiscal results would not be significantly different from the prior year's results, was intentionally devised as part of a scheme to induce investors like Barbee to not sell while waiting for annual fiscal results to be disclosed.

[36] On information and belief, the Company put undue pressure on Wacha and then Sethi to misrepresent material facts and/or omit to state material facts in connection with such filings which contributed to such abnormally high CFO turnover and the above-alleged additional compensation provided to Sethi at his resignation/termination of his services as CFO.

financials had withdrawn from representation and obtained a $1.4 million judgment against the Company; and/or (iv) the financials for the first and second halves of the fiscal year were materially inconsistent, among other things.

**A.    Amira Finally Admits It Had Previous Knowledge Of The SEC's Notice And Conditions Precedent To Avoid Delisting, But The Company Did Not Disclose These Facts Prior To The SEC's Previously Announced Deadline Or The NYSE's Trading Halt In Shares Of The Company.**

320.    As discussed above, when receiving the August 2019 SEC notice regarding non-compliance with listing rules, the Company filed a misleading press release and related Form 6-K that mischaracterized the notice and omitted to disclose some of the material facts disclosed therein, which omissions made the other representations of material fact misleading.

321.    To date, Amira has neither made a copy of this SEC notice public nor disclosed its contents verbatim.

322.    Buried in the instant Form 20-F filing, the Company publicly discloses (for the first time) that the SEC notified the Company in August 2019 that if the Company failed to file Forms 20-F for the fiscal years ending March 2019 and March 2020, and the Form 6-K for the six-month period ending September 30, 2019, on or before August 16, 2020, then the Company would be suspended from trading on the NYSE and delisting procedures would be commenced.

323.    Prior to this filing, the Company never previously disclosed these conditions precedent to a trading suspension, or that the SEC had established a deadline for such conduct.

324.    As an investor purchasing or holding Amira stock after August 16, 2019, Barbee should have been given adequate or at least constructive notice of the SEC's position regarding these late filings and the deadline it had established for potential trading suspension and/or

-59-

delisting, either through an SEC filing, press release or other Company disclosure, and every reasonable investor would deem this information material when deciding whether to purchase, hold or sell shares in the Company.[37]

## B.    Internal Litigation Was Not Timely Or Adequately Disclosed.

325.   As to pending litigation disclosures, this filing discusses the April 2012 rice shipment litigation, the April 30, 2018 litigation initiated by the Company against IDBI bank, the November 16, 2017 judgment obtained against the Company by its attorneys (discussed further below), an arbitration commenced on June 30, 2019 against a food company and a settlement reached by the Company in July 2020, among other things.[38]

326.   Note 39 to this filing discloses and discusses the status of class actions and other litigation, including the "short seller" class actions and includes another summary of the status of the action commenced by the Company on April 30, 2018 against IDBI bank, but there is no mention of any internal litigation between parties identified by name.

327.   However, the Company and/or Amira India, on the one hand, and Chanana (and possibly certain affiliates), on the other hand, were litigating the conversion of $16,394,751 of loans into equity at the end of March 2019.

---

[37]Although Barbee received no such notice, the largest public investor in Amira at the time (i.e., FMR, LLC), filed a Schedule 13G Amendment a few days before the date of this letter, disclosing that it had dumped its entire 3,000,000 share block, although it is unclear whether, when or if Amira ever discussed continued listing requirements with this investor or when Amira actually received the letter or the first notice of the SEC's intent to send this letter or what its contents would include.

[38]The July 2020 settlement has no negative impact on the financials and its disclosure is wholly gratuitous, but the Company took time to address it while failing to disclose the civil litigation between Chanana and others by name or the criminal charges leveled specifically against Chanana and others by name.

328.    This fact only became known to public investors in August 2020, and even then it was only known to those carefully reviewing and comparing this Form 20-F filing to prior SEC filings.

329.    This internal litigation disclosure was made in F-2 to this Form 20-F, as part of the independent public accounting firm notes accompanying the filing, and moreover, the notes themselves describe this transaction as follows: "Amira India converted a loan of roughly $16,394,751 from a related party into equity, and that the related party subsequently commenced litigation concerning such conversion."

330.    The omission of Chanana's name from this disclosure is material, deliberate and a departure from the structure of disclosures in prior filings which have up to this point disclosed that "Chanana and his [unidentified] affiliates" were one the holders of $16,394,751 in debt (although that amount had recently decreased, as mentioned in a prior SEC filing above), and the instant disclosure is framed in these terms to distract investors from focusing on the identity of the subject parties, a classic example of omitting to state material facts necessary to make other representations of material facts not misleading.[39]

///

///

///

---

[39]Notably, the Audit Committee: (i) would have had to review and approve of the underlying related-party transaction; (ii) would have had to approve the use of Chanana's name in this disclosure (and could have restricted the use of his name in this filing); and (iii) was composed of sitting directors of the Company, and for now, Barbee respectfully reserves the right pending facts and theories to be developed and tested in discovery, to make any or all of these individual committee members parties to this matter in connection with one or more claims or causes of action.

331.    The "affiliates" should be identified at this point and the omission of their

identity renders prior representations of material fact misleading.[40]

332.    The amount of the debt converted is also puzzling and adequate disclosure

requires an explanation or reconciliation between the amount of debt owed to Chanana and these

affiliates, as disclosed in a September 2018 filing and the amount of debt allegedly converted to

equity in November 2018 and giving rise to the internal litigation involving Chanana.[41]

333.    Note 7 at F-25 of this Form 20-F also discusses this internal litigation, in terms of

the deconsolidation, stating that the "Group" (defined earlier in the filing as Amira and all of its

subsidiaries) converted the loan (again from an unidentified related party) and such unidentified

party later commenced litigation.

334.    This note also confirms that the management of RYCE (the new ticker symbol for

Amira) does not believe that the related party will prevail in litigation.

///

---

[40]Federal rules and regulations require identification of an issuer's "control persons" and persons owning a certain percentage of an issuer's outstanding stock, which is especially important here because: (i) Anil Chanana (Karan Chanana's father) is the Managing Director in Karam Enterprises ("Karam"), the sole (or largest) distributor of Amira Foods for the Middle East and some African countries; (ii) Karam was owned in large part by Chanana's father (34%), Chanana (24%) and Amira itself (5%); and (iii) on information and belief, Chanana's father is one of Chanana's unidentified affiliates here.

[41]Although the loans once payable to Chanana and some unidentified "affiliates" were listed at $16,394,751 in prior SEC filings, the Form 6-K for September 2018 indicated that total loans from key management personnel had been reduced to roughly $16.2 million, of which no more than $14.7 million was payable to Chanana and such unidentified affiliates, meaning that either the Form 6-K for September 2018 understated the debt owed to Chanana and his affiliates, or the debt somehow reverted back to exactly $16,394,751 after September 2018 for reasons material to the underlying litigation involving Chanana, among other things, but which have not been disclosed.

335.    Moreover, this filing states that RYCE (not Amira India) followed the "due process for conversion" and that the "chances of having outcome in favor of RYCE is [sic] probable."

336.    According to the accounting firm preparing a comment to the filing, "management" feels that "there is probability of having outcome of such litigation in favour of the company."

337.    It is unclear why Amira management is referring to the probability of Amira prevailing in the litigation (instead of Amira India) and this statement by Amira misrepresents the identity of the parties to the ligation (a material fact) and/or omits to state material facts necessary to make other representations of material fact not misleading.

338.    It is also unclear whether Chanana was part of the "management" reaching the conclusion as to the probably of Amira prevailing against Chanana and his affiliates, but the Audit Committee would have had to approve the final language of this disclosure, and this Committee could have removed or omitted these material facts from the approved filing, which is another fact to be developed and tested in discovery when determining whether there are grounds to name these individuals as parties to this matter.

339.    It is also unclear from this filing whether the conversion right was exercised by Amira or by Amira India.

340.    For example, the instant filing states that Amira India converted the debt (e.g., on page F-2 as alleged above), but it sometimes states that Amira converted the debt (e.g., RYCE followed the due process for conversion and management believes RYCE will prevail, as alleged above).

341.    Because the identity of the one exercising the conversion right is material to this litigation, the inconsistent descriptions misrepresent material facts and/or omit to state material facts necessary to make other material facts not misleading.

342.    Finally, in Note 22.2 on page F-34, the Company discloses that debt from Chanana was converted on November 14, 2018, but this note does not mention litigation or suggest that such conversion might be reversed.

343.    Since litigation was presumably commenced after the debt conversion in November 2018 and prior to the close of the March 2019 fiscal year covered by this filing, not much time was spent trying to resolve this matter internally.[42]

344.    The litigation was commenced before the March 2018 Investor Presentation was released to the public, attached to an SEC filing or put on Amira's website, and Chanana had ceased to invest in the companies at such time, despite the representation in such Investor Presentation that Chanana had continued to invest in the company since the IPO.

345.    The litigation was commenced before the September 2018 Investor Presentation was released to the public, attached to an SEC filing or put on Amira's website, and Chanana had ceased to invest in the companies at such time, despite the representation in such Investor Presentation that Chanana had continued to invest in the company since the IPO.

346.    The identity of the parties to this litigation and the filing date of such litigation are both material to Amira shareholders.

_____

[42]Although litigation filing dates were routinely disclosed in Amira's prior Form 20-F filings, this time the Company intentionally omitted the filing date, leaving investors in the unenviable position of needing to "presume" when the court battle began, a presumption (the need for which) the federal and state securities acts were designed to prevent.

-64-

347. The material facts of this ligation should have been disclosed and made public prior to the significantly late Form 20-F filing.

348. Moreover, the filing is misleading and omits material facts to the extent it incorrectly states or implies that the outcome of such litigation will have very little impact on the financials, and to the extent it does not identify or discuss any other potential problems.

349. For example, having lost the going concern assumption for Amira India, the seventeen (17) acres of land, property and plant transferred to Amira India should be carried at their realizable value which should be much higher than prior carrying values, assuming Wacha's prior statements about the value of this property were truthful and accurate.

350. Indeed, depending on the outcome of the internal litigation, the Company may be required to revert to reporting on a consolidated basis, which would require the disclosure of different financials for investors.

351. In short, this filing omits many material facts necessary to make the other representations of material fact not misleading and it misrepresents some of the material facts.

352. It was an integral to Barbee's continued investment in the Company that Chanana would provide a source of funds when needed (especially given the large short-term debt).

353. It would have been material to Barbee that Chanana and Amira (or its largest subsidiary) were in litigation, and this material fact was disclosed in a vague and untimely manner, more than eighteen (18) months after such litigation had commenced.

///

///

///

-65-

### 1.    Disclosure Regarding Chanana's Employment Agreement Omits Facts Necessary To Make Other Representations Not Misleading.

354.    Given the debt conversion litigation that may or may not still be pending as far as Amira shareholders know (shareholders are left to speculate, absent any updates from the Company), Chanana's employment agreement with the Company becomes more significant to investors, and the Company's failure to adequately disclose the terms or status of such agreement is troubling and actionable, given the prior detailed disclosures regarding his employment contract and the Company's overwhelming reliance on his financial support, among other things.

355.    For example, the Company previously disclosed the terms of prior agreements between itself and Chanana, including those of Chanana's employment agreement from 2012.

356.    But in this annual filing, the Company discloses that such employment agreement ended in 2017, and Chanana has not been compensated in his capacity as CEO since 2017, although as of the end of March 2019, he and the Company were still negotiating a new compensation agreement with respect to his status as CEO.

357.    Even though Chanana received cash advances for $536,000 in respect of 100,000 share awards granted to him for his services as Chairman in 2018, which the Board approved in October 2017, as of the close of the fiscal year ending March 2019, the Company had not granted any share options to Chanana for his service as Chairman for that year.

358.    Despite the lack of any agreement, Amira is booking $578,247 and $701,226 in advance payables to Chanana for the periods ending March 2018 and March 2019, respectively, for services that have not been identified, described or otherwise disclosed in this filing.

-66-

359.    The Company's failure to disclose the basis for booking advance payables to

Chanana for 2018 and 2019 is an omission of material facts necessary to make other

representations not misleading and/or misrepresents material facts relevant to the internal

litigation or otherwise.

360.    This filing mentions an unidentified Claim Purchaser who is obligated, under

unidentified terms, to accept 3,000,000 common shares in exchange for certain debts purchased

by the Claim Purchaser at undisclosed times and in undisclosed amounts.

361.    The filing also states elsewhere that Chanana received "3,000,000 shares issuable

upon conversion of obligations granted on March 25, 2019."[43]

362.    If there is any connection between Chanana and the Claims Purchaser, this fact is

material and should have been disclosed to investors long ago.

363.    This filing separately states that the Company owed $10.86 million to "related

parties" at the end of the period, but $3.0 million of this debt could be converted to 3,000,000

common shares (this represents a $1.00 per share valuation or less than 4% of the price to be paid

by investors on the NYSE at the time).

364.    On information and belief, Chanana is the "related party" holder of the debt with

such share conversion rights, this is a fact material to the underlying litigation, and it should have

been previously disclosed to investors, along with the manner in which these conversion rights

were valued.

///

_____

[43]On or about March 25, 2019, Amira was trading above $33.00 per share, and its market
capitalization exceeded $70.0 million.

365.    These disclosures concerning the Claims Purchaser, the $3.0 million of convertible debt from a "related party" and Chanana's potential connection to any or all of these matters, along with the details of his employment contract status and negotiations (including the purpose of booking any advance payables to Chanana), are all material to the pending internal litigation involving Chanana and such disclosures in the instant filing misrepresent material facts and/or omit facts necessary to make other representations regarding these matters not misleading.

## 2.    Contradictory Disclosures Regarding Chanana's Personal Guarantees And Indemnity Rights

366.    Historically, Note 31.2 to each Form 20-F discusses the status of Chanana's personal guarantees in favor of the consortium of banks making loans to Amira India, and includes a statement to the effect that Amira has also issued similar personal guarantees, among other things.

367.    In the same note or elsewhere, Amira has historically stated in each Form 20-F that it has agreed to indemnify Chanana for his guarantees as permitted under its Amended and Restated Memorandum and Articles of Association and pursuant to certain indemnity agreements.

368.    But in Note 31.2 to the instant filing, the Company states that: (i) Chanana has previously personally guaranteed certain debt of Amira India for the fiscal years ending March 2017, 2018 and 2019; (ii) RYCE has previously issued personal guarantees; and (iii) none were executed post 2015.

369.    Immediately following these three points, this Note 31.2 states: "We do not believe these are valid anymore. However RYCE has indemnified Karan A. Chanana, its

directors and officers. In the event any of the lenders retrospectively attempts to dispute this, RYCE will be liable under the indemnity already given to Karan A. Chanana."[44]

370.    This filing is certainly vague as to which guarantees are no longer valid, including those between Chanana and Amira India's lenders, Amira and Amira India's lenders, and it leaves unanswered the question as to whether the Company has continuing indemnification obligations to Chanana.

371.    Taken together, the disclosures in this Note 31.2, coupled with the other representations in this filing concerning the Company's indemnification obligations to Chanana, misrepresent material facts and/or omit material facts necessary to make other representations not misleading.

372.    These indemnity issues are even more significant to investors, given the pendency of the litigation between Amira India and/or Amira and Chanana, and the fact that Chanana is the largest shareholder of Amira (and of Amira India, should the share conversion be upheld in litigation).

373.    The Company was not required to wait for the Form 20-F filing to make disclosures about the existence of this litigation or the identity of the parties thereto.

374.    The above-addressed disclosures were untimely and should have been made before the Form 20-F was filed.

///

///

---

[44]Elsewhere this filing indicates that Chanana has issued similar personal guarantees for the periods ending September 2018 and March 2019 and the Company has agreed to indemnify Chanana for such guarantees.

C.    **Amira India's Insolvency And The Related Liquidation Proceeding Were Not Adequately Or Timely Disclosed.**

375.    This filing references a proceeding commenced at some unidentified point before March 31, 2019, by an unidentified member of Amira India's lenders under the Insolvency and Bankruptcy Code, 2016, seeking repayment of a $14.1 million loan.

376.    And apparently this lender was followed by other unidentified lenders in such proceeding, all to the Company's "consternation."

377.    Although the filing does not indicate when Amira India first became insolvent, Amira India was insolvent as early as November 14, 2018.

378.    Indeed, this filing states that "[t]he loss on dilution has resulted the [sic] carrying amount of the Associate at Nil value as of November 14, 2018 as well as March 31, 2019."

379.    Amira should have timely disclosed Amira India's insolvency and it should have timely disclosed the related liquidation proceedings as well, and no later than November 14, 2018, instead of waiting to disclose these facts through the untimely Form 20-F filing in August 2020.

380.    The date the insolvency proceeding was commenced, the parties to it, the amount of debt at issue and the status of proceeding are all material facts, none of which have been timely or adequately disclosed to Barbee or other investors, in this filing or otherwise.

381.    The filing also states that: "The report of our independent registered public accounting firm for the year ended March 31, 2019 included herein contains an explanatory paragraph indicating that there is substantial doubt as to our ability to continue as a going

///

-70-

concern is [sic] dependent on a plan to address the pending NCLT application by the lenders of Amira India. See Item 18 Note 37.3."[45]

382.   This Note 37.3 states in part, "we have paid down the current liabilities" and includes conclusions such as "[m]anagement is confident to address the issue of liquidity" and "management is confident that the going concern assumption has not been impacted."

383.   On information and belief, management was not confident that it could address the liquidity issues when this statement was made.

384.   Indeed, management conceded in this filing that cash, cash flow, debt from lending facilities or other loans "may not" be sufficient to meet working capital requirements.

385.   Moreover, on information and belief, management was not confident that the going concern assumption had not been impacted earlier in the fiscal year or by the end of the fiscal year.

386.   Management was aware of material facts establishing that the Company's going concern status had been or would soon be impacted, at the time that it expressed confidence that the going concern assumption had not been impacted.

387.   If management was confident that it could address the liquidity issues and/or that the going concern assumption had not been impacted, despite the negative book value, annual loss of $357 million and Amira India's insolvency, such confidence was not based on facts and management failed to disclose that such confidence was not based on factual grounds.

388.   If management's confidence in meeting the liquidity issues and that the going concern assumption had not been impacted was based on factual grounds, those facts are not

_____

[45]On information and belief, the Audit Committee limited the scope of this disclosure.

-71-

disclosed in this filing, which constitutes the omission of material facts necessary to make other representations of material fact not misleading.

### 1. Misrepresentations And Omissions Regarding Deconsolidation Expenses

389.    The statements and calculations of Amira's liabilities and total net equity in this filing, as it relates to the deconsolidation or to insolvency proceeding or otherwise, contain a number of misrepresentations or omissions of material fact.

390.    For example, the "Other Expenses" of $196.3 million appearing on the consolidated profit and loss statement in this filing includes a list of typical types of expenses for this category, but also includes a subcategory of "other" exceeding $179.7 million.

391.    Since this subcategory of "other" expense amount is typically only a few million dollars in any given fiscal year, and since the $179.7 million reported this year is almost three times gross annual revenue for this year and is slightly more than total shareholder equity in both companies at the end of 2018, the breakdown of these expenses (by type and amount) is certainly material and requires at least some level of disclosure.

392.    However, the only direct explanation given is that the $179.7 million in expenses includes the less than $13.7 million in dilution on the disposal of equity in Amira India, with the further caveat that although the equity in Amira India is now negative, it cannot be carried below $0 based on an accounting rule.

393.    This statement regarding the "carrying amount" not falling below zero is misleading.

///

-72-

394.    The Company may be prohibited from carrying a negative value on this balance sheet pursuant to a specific accounting standard, but it is not prohibited from disclosing the negative value of its interest in Amira India to its own shareholders, especially if such statement is qualified.

395.    Indeed, the calculations are possible and such disclosure is necessary to comply with state and federal securities laws.

396.    Further, this filing concedes that management has already prepared and approved Amira India financial statements for consolidation purposes, which would reveal Amira shareholder's interest in Amira India, and management will presumably make those available to the public after the Company receives the official liquidator's approved financial statements.[46]

397.    As to the remaining $166.0 million of actual expenses in the subcategory of "other" expenses, the Company says very little, other than that they "primarily increased as a result of the Amira India deconsolidation."

398.    If even a significant portion of these $166.0 million of expenses was incurred primarily in connection with the deconsolidation, such fact further evidences the omissions and misrepresentations of material fact in the previous March 2018 Investor Presentation and September 2018 Investor Presentations, since each  presentation included balance sheets on a

///

///

///

_____

[46]It is telling that the management failing to make these statements available to investors (perhaps pretending that it is somehow prohibited from doing so, which it is not) is the same management creating the misleading March 2018 and September 2018 Investor Presentations.

deconsolidated, reorganized basis, but no accounting was made therein of the assets that would be depleted and/or expenses that would be incurred to legally report on a deconsolidated basis.[47]

399.    Moreover because both of these presentations were made available to the public months _after_ the Company had gone through the debt to equity conversion and was embroiled in the insolvency proceeding, the Company knowingly and intentionally made misrepresentations of material fact (and omitted facts necessary to make other representations not misleading) by presenting separate balances sheets for Amira and Amira India in such investor presentation that did not reflect the substantial expenses actually incurred in connection with the deconsolidation, either via diminution in asset values and/or increased debts to account for these expenses, or otherwise.

400.    It is a misrepresentation of material fact to claim that most of these $166.0 million in expenses were incurred in connection with the deconsolidation.

401.    This filing also omits several material facts regarding this $166.0 million in "other" expenses and such omissions make other representations of material fact in this filing misleading.

402.    The omission of material facts regarding this $166.0 million of "other" expenses may lead a reasonable investor to believe that this amount is composed of typical types and sums of such expenses.

403.    However, neither the types nor amounts of expenses in this category are typical, and the omission of details regarding them renders the "other" description misleading.

_____

[47]SEC rules and/or NYSE listing standards require Amira to report on a consolidated basis with respect to any subsidiary in which Amira held a controlling interest.

404.   The material facts regarding the $166.0 million of unaddressed expenses in connection with deconsolidation (e.g., the category or basis for the expense and manner in which was calculated) should be disclosed to make other representations of material fact in this Form 20-F filing not misleading as well.

405.   On information and belief, some of the expenses at issue were incurred in a way that directly or indirectly benefitted defendants, or any of them, or any of their affiliated individuals or companies, including those identified in the above-filings simply as "affiliates" of Chanana, including Chanana's father.

406.   Any expense included in these amounts that benefitted any of the defendants, including Chanana or his affiliates, directly or indirectly, should be explained in detail, especially if such expenses is not contemplated in any contract between the payor, on one hand, and the recipient, including Chanana and/or his affiliates, on the other hand.

407.   If such expenses are contemplated in a contract between the payor and any of the defendants or any of their affiliates, Amira has not disclosed the terms of such contract to its investors, although Amira typically includes several types of agreements between itself and any of its directors or officers, as well as agreements between Amira India and others, as exhibits to each Form 20-F.

408.   Failing to adequately describe or identify the goods or services making up these $166.0 million of expenses, or the payor, or the ultimate recipient of them, is equivalent to omitting or refusing to disclose material facts necessary to make other representations made about these expenses in this disclosure (or otherwise) not misleading.

///

-75-

409.    This misrepresentation and omission of material facts occurred at a time when the company had a duty to speak about these expenses, but failed to adequately do so.

410.    The omission of material facts necessary to make this disclosure not misleading violates state and federal securities laws and constitutes an intentional and/or negligent misrepresentation or omission of material facts, upon which Barbee reasonably relied, and which proximately caused damages to Barbee.

411.    Moreover, the filing misrepresents and omits to state material facts about the impact of deconsolidation on Amira's balance sheet.

412.    For example, the filing states that "[t]he deconsolidation of Amira India reduced **our** debt from $250.3 million . . . .to $25.08 million. " (Emphasis added).

413.    However, any suggestion that this debt was Amira's obligation (i.e., "our" obligation) is inconsistent with the March 2018 Investor Presentation and September 2018 Investor Presentation, both of which listed all or most of this debt as Amira India's obligation.

414.    Either this SEC filing or these investor presentations misrepresent material facts concerning the debtor for these liabilities and either or both of them omit material facts necessary to make the other representations concerning such debt not misleading.

415.    Moreover, Amira has guaranteed Amira India's debts, and the deconsolidation between Amira and Amira India by itself would not impact the validity of such guarantees, making the above-mentioned statement about the impact on the debt resulting from deconsolidation further misleading,

///

///

-76-

416.     Successful "deconsolidation" (i.e., resulting in Amira owning less than 50% of Amira India) relies on Amira India successfully defending Chanana's lawsuit concerning the debt to equity conversion.

417.     But the plan to address the NCLT application is or was being developed by a "management team," composed of certain individuals, at least one of whom (Chanana), who was or is currently in litigation with Amira India concerning the loan to equity conversion, and Amira would have been required to continue reporting on a consolidated basis as long as it remained on the NYSE if Chanana was successful.

418.     Thus, Chanana's success in the litigation would adversely impact Amira's ability to remain deconsolidated, but Amira and Amira India must work together with Chanana to successfully address the NCLT application, creating a conflict that a reasonable investor would deem material and that should have been timely disclosed.[48]

419.     Finally, the allocation of equity between the Company and Amira India misrepresents and omits material facts (or applies different accounting standards without specifically disclosing which ones are used), since the filing states that: (i) on a consolidated basis, the shareholder's equity in Amira at the end of March 2019 was roughly negative $1.4 million while the equity attributable to the non-controlling interest in Amira India was negative $13.7 million; but (ii) Amira's carrying value in Amira India was $0 as of mid-November 2018 and at the end of the fiscal year.

---

[48]In addition, the loan to equity conversion involving Chanana is material to the liquidator's asset and liability calculations in the insolvency proceeding as well as to the 1.33 current asset to current debt ratio that could impact covenants material lender's claims in such liquidation proceeding.

### 2. The Undisclosed Date(s) Of Insolvency Are Relevant To State Law Claims.

420.    The $166.0 million in expenses incurred primarily for deconsolidation were enough to cause the Company's liabilities to exceed its assets on certain dates.

421.    On some date(s) during the fiscal year covered by this filing, including the last day of such filing (as noted above), Amira's liabilities exceeded its assets.

422.    The sale of the Company's securities at a time when its liabilities exceed its assets, without disclosing this fact at the time of sale, is a violation of the Ohio Securities Act, as set forth below.

423.    Amira's and/or Amira India's ratio of current assets to current liabilities was less than 1.33 at one or more times during, before or after times in March 2019, triggering rights by a lender or lenders to demand repayment from the Company and/or from related parties (who may or may not be currently entitled to indemnity and who may or may not be embroiled in litigation with the Company as discussed herein), and such repayment(s) may have rendered the Company insolvent at the time.

424.    The Company failed to timely or adequately disclose when the above-mentioned ratios were less than 1.33 and these facts would be material to a reasonable investor, given the various lenders' rights, and this conduct constitutes an omission of material facts necessary to make other representations of material fact not misleading, thereby violating the federal and state securities laws at issue in this matter and constituting intentional or negligent misrepresentation of material facts meant to induce investors not to sell their shares.

///

-78-

**3.** **If Deconsolidation/Reorganization Occurred As Part Of A Scheme To Directly Or Indirectly Defraud Or Hinder Amira India's Creditors, The Plans Concerning Deconsolidation/Reorganization Should Have Been Timely Disclosed, And Any Underlying Facts Constituting Any Such Fraud Should Have Been Timely Disclosed.**

425. The Company has never adequately explained the reasons for the reorganization and reporting on a deconsolidated basis, despite the significant expense associated therewith.

426. After the debt to equity conversion, reorganization and deconsolidiation, Amira not only lost its controlling interest in Amira India, but Chanana (and his unidentified affiliates) obtained a controlling interest in Amira India, in addition to his controlling interest in Amira.

427. On information and belief, this reorganization and debt to equity conversion were designed and implemented so that Amira could avoid disclosing to shareholders the true status of the assets and liabilities held between the two companies, as well as the status of litigation involving Amira India, as part of a scheme to induce investors to not sell their shares of Amira.

428. Moreover, Amira was able to reduce its equity interest in Amira India below the controlling interest threshold without selling any of its position (which might have entailed additional SEC or other filings, among other things), by converting (or having Amira India convert) Chanana's debt to equity, thereby diluting the subsidiary and decreasing Amira's percentage of ownership in it.

429. Notwithstanding whether Amira and Amira had any legitimate motives for the deconsolidation, U.S. federal securities laws require that Amira disclose any basis or justification for reorganization if the issuer or any of its control persons were acting with *scienter* and/or with the intent to commit a crime, or if acts and events occurring in order to achieve deconsolidation ///

would constitute a violation of state or federal securities laws or would violate a law(s) of the country in which a non-U.S. shareholder resides.

430.    If deconsolidation or reorganization was designed to hinder or delay creditors (based on the lack of publicly available information, among other things), it may very well constitute violations of the federal Fraudulent Transfer Act, which could harm the value of the Company and/or investors.

431.    Indeed, if any transfer of assets or liabilities occurred at a time when the debtor was insolvent, or if fair value was not provided for any asset transferred by a debtor to a third party, the transactions could easily be unwound, leaving the Company with close to $166.0 million in expenses incurred in a pointless (and unlawful) exercise.

432.    A reasonable investor would deem it material to know whether Amira or Amira India were deconsolidating with the intent to hinder or avoid creditors or if either entity was otherwise engaged in unlawful conduct.

433.    Deconsolidation issues aside, the Form 20-F for this period raises questions as to whether all revenue is being obtained lawfully (and was obtained lawfully in prior fiscal years).

434.    For example, this filing confirms that Amira is subject to the U.S. Foreign Corrupt Practices Act and that it does business in other jurisdictions that have similar legislation, and as to these laws, the Company discloses that "in certain circumstances, strict compliance with anti-bribery laws may conflict with local customs and practices, which may negatively impact our results of operations."

///

///

-80-

435.   None of the prior SEC filings and none of the company's Officers or Directors has previously disclosed whether the Company or any individual associated with it has been accused of or found guilty of violating specific federal or foreign anti-bribery laws.

436.   Given the issue, the Company should clarify whether it obtained any revenue unlawfully, and its silence is equivalent to omitting material facts necessary to make this (and other) representations concerning its revenue source(s), in light of the circumstances under which they were made, not misleading.

437.   On information and belief, the Company's revenue declined and/or its expenses increased as a direct or indirect result of the Company's inability to bribe or continue bribing foreign officials or others or as a result of fines, penalties or expenses incurred in connection with prior or current bribery efforts.

438.   On information and belief, such bribery has occurred previously without prior disclosure to US investors.

439.   A reasonable investor would deem it material to know if the Company was engaging in bribery efforts when deciding whether to hold, purchase or sell shares of the Company.

### D.   Despite Being A Minority Shareholder In Amira India After The Deconsolidation/Reorganization, Amira Claims To Have Assurances That Conflicts Will Be Resolved In Its Favor.

440.   The Company's Amended and Restated Memorandum and Articles of Association permit a shareholder or Director such as Chanana to participate in and vote on Company decisions, even if he has an actual conflict with the Company, as long as his interest is disclosed prior to his participation in the Company action or decision.

441.    The Company does not have written procedures for resolving certain types of conflicts.

442.    On page 27 of the Form 20-F for March 2019, when discussing the fact that the Company then lacked the ability to control Amira India, the Company states that "[w]e have not adopted a policy for resolving conflicts of interest."

443.    But on the same page, the Company goes on to state that "[t]here is assurance that conflicts of interest will be resolved in our favor."

444.    On information and belief, these assurances are coming from Chanana, who along with his unidentified "affiliates" has become a majority shareholder of Amira India based on the debt to equity conversion (although he is also litigating such conversion).

445.    On information and belief, these assurances are related to the internal litigation between Chanana and Amira India.

446.    The material facts upon which the Company bases its belief in such assurances should be disclosed, given the importance to Amira and its shareholders, including Barbee, that conflicts will be resolved in Amira's favor, and given the other representations made by the Company regarding the lack of written conflict resolution procedures and given the fact that interested shareholder Directors are not precluded from participating in such Company decisions if such conflicts are timely disclosed to the Company.

447.    The omission of material facts concerning the basis for the Company's "assurance" regarding conflicts makes other representations of material fact misleading and violates state and federal securities acts and is actionable in tort.

///

-82-

448.    On the other hand, if the Company lacked such assurances that conflicts would be resolved in its favor, the above-quoted statement to the contrary intentionally misrepresents material facts or omits material facts needed to make the statement regarding such assurances not misleading.

### E.    Litigation With Company Lawyers

449.    The $1.4 million judgment obtained by Amira's own counsel against it nearly three years prior to this filing, and finally disclosed in this filing, should have been disclosed in a prior filing(s) made with the SEC, pursuant to various state and/or federal securities acts, regulations, SEC rules and/or NYSE rules.

450.    Although again not explained or disclosed in this filing, the debt to these attorneys was incurred in connection with litigation between Amira and individuals claiming in part that Amira was filing false financials, and at some point Amira's counsel withdrew from such representation.

451.    On information and belief, this liability has not been included in any of the balance sheets contained in any of the SEC filings made after such judgment entry against the Company and prior to the instant Form 20-F.

452.    The exclusion of this judgment amount, in whole or in part, from the balance sheet at any time it was outstanding and not satisfied renders the balance sheet false, materially deficient and misleading and constitutes the omission of material facts necessary to make other disclosures and representations of material fact not misleading.

453.    It is also misleading or an omission of material fact to not account for such settlement with the "short sellers" in this filing or elsewhere, especially since prior disclosures

indicated that such settlement would be accounted for in the fiscal year ending March 2018, but no disclosure of such settlement amount was included in the Form 20-F for that period or in the instant filing.

454. If the settlement amount with the "short sellers" was included within the assets or liabilities in the instant filing or in any prior balance sheet(s) or revenue statement(s) filed with the SEC, such filings did not specifically explain or disclose the actual amount of such settlement, and such fact would be material to investors, given the years over which such litigation occurred and the number of times the Company pointed to such litigation as a reason or excuse for not meeting goals and objectives.

**F.      This Filing Is Inconsistent With The Form 6-K Filed For The First Half Of The Same Fiscal Year And Misrepresents Material Facts And Omits Material Facts Necessary To Make Other Representations Not Misleading.**

455. Revenue for the twelve month period covered in this filing was reported as roughly $64.4 million.

456. However, the Form 6-K for the first six months of this fiscal year reported revenue exceeding $123.0 million.

457. This filing does not adequately explain this discrepancy and it cannot be reconciled under GAAP without additional explanations not contained in this filing.

458. Even if this filing excluded some of the revenue previously attributed to Amira India while the companies were reporting on a deconsolidated basis, the exclusion of a portion of such revenue when Amira began reporting on a deconsolidated basis would not account for the difference in revenue reported between the two periods.

///

459.    If the difference is based in part or in full on the fact that roughly $96.4 million of revenue initially received by Amira India was "reversed" under IFRS 15 in connection with the deconsolidation and/or the liquidation processes, this fact should be or have been timely disclosed and explained long before August 2020.

460.    It is entirely misleading to claim that this adjustment "has been done purely to meet with the requirements of IFRS 15" without qualifying the statement by additionally disclosing that INFS 15 would not have required such revenue reversal, but for: (i) the Company's decision to reorganize (in order to report on a deconsolided basis) and/or the commencement of the liquidation proceedings, and (ii) the manner in which Amira adopted this financial reporting standard.

461.    Indeed, Amira omitted to state the reasons why IFRS 15 was applied to this filing, making other representations regarding the use of this reporting standard misleading.

462.    If the Form 6-K for September 2018 and/or the September 2018 Investor Presentations should have been  restated or amended to revise statements of revenue or other related matters, but Amira failed to do so timely or otherwise, as part of a scheme to induce investors to not sell their shares.

463.    Finally, the Notes to this filing include a statement of "events after the reporting period" which states that "there have been no material events other than already disclosed in the financial statement after reporting date which would require disclosure or adjustments to the financial statements as of and for the year ended March 31, 2019" other than the departure of Sethi and hiring of Speck in mid-2019 and the 1:20 reverse stock split in December 2019.

///

464.   This statement was false when made and the Company was aware of such falsity at the time when Speck and Chanana certified it under the Sarbanes-Oxley Act of 2002.

465.   For example, the Company was well aware of the criminal charges against Chanana and Amira India for fraud and stock manipulation by the time of this filing, as detailed below, and the outcome of those charges would require disclosure and/or would require adjustments to the financial statements as of and for the fiscal year ending March 2019.

466.   This statement also intentionally misrepresents material facts and omits to state material facts necessary to make other representations made in the filing (including those regarding the financial statements for the fiscal year covered by the filing) not misleading.

467.   Even assuming arguendo that Amira could not have timely filed the Form 20-F for this time period without unreasonable expense, the Company did not need to wait for the Form 20-F filing to disclose to investors: (i) the internal litigation involving Chanana; (ii) Amira India's insolvency proceeding; (iii) the foreign agency's accusations of fraud and stock manipulation against Chanana and Amira India; or (iv) the content of the August 2019 SEC letter notifying the Company of the conditions precedent to avoid delisting.

468.   Amira could have filed a simple disclosure(s) or even issued a press release(s) in 2019 regarding any or all of these matters and the benefit to investors of being made timely aware of these issues outweighed the financial burden on Amira of timely disclosing these facts.

469.   Amira's failure to timely disclose such facts, or any of them, occurred as part of a scheme to induce shareholders to continue holding, and to not sell Amira stock and violates state and federal securities laws.

///

**Events Between Close Of March 2019 Fiscal Year And Trading Halt In August 2020**

470.    After the close of the fiscal year ending March 2019, and all throughout the fiscal year ending March 2020, the Company issued a few press releases focusing on new customer contracts and/or renewed contracts with prior customers.

471.    But while intentionally speaking about self-serving developments, the Company did not mention or comment on significant trading activity following the close of the March 2019 fiscal year or the existence of the criminal charges, to wit:

**A.    Pump and Dump**

472.    By the end of March 2019, the Company had lost more than $357 million but: (i) Harash Pal Sethi received shares having a value of $199,503 for serving as Chairman of the Audit Committee the prior year; (ii) Messrs. Harash Sethi, Larren and Malik were issued share awards valued in dollar amounts at $225,000, $95,233 and $45,205, respectively, as compensation for their services as non-executive directors; and (iii) Messrs. Harash Sethi, Larren and Malik were also issued 135,000; 33,000 and 11,667 shares, respectively, for other services (all of which were valued at $5.00).

473.    A few weeks after the March 2019 fiscal year came to a close, but more than one year before the Form 20-F for such period was filed with the SEC, the share price in the Company experienced a short period of highly volatile, both in trading volume and in price (despite the lack of any new information being made public, with the possible exception of the September 2018 Investor Presentation).[49]

_____

[49]It is unclear if this September 2018 Investor Presentation was posted on the Company's website and/or presented to individual investors prior to or during the time of the price and trading volume spike.

474.    Specifically, the price and volume of trading in Amira shares each more than tripled during this time period (which extended over a matter of a few days or weeks), and ended shortly before the  September 2018 Investor Presentation was filed with the SEC.

475.    Messrs. Harash Sethi, Larren and Malik stood to gain significantly by the share price tripling during the time period after which such shares were issued to them and before the negative facts in the Form 20-F were disclosed to investors, especially if they had access to any derivative markets and were able to sell options, futures or derivatives on these positions during such volatility, even if they did not sell their own shares outright.

476.    On information and belief, the share price was manipulated to create such volatility and some or all of the shares received by Messrs. Harash Sethi, Larren and Malik prior to the end of March 2019 were sold at these significantly higher prices (or used in connection with options, futures or derivative on such positions sold during the period of heightened share price) and prior to the filing of the Form 20-F for the period in which these individuals received such shares.

477.    The Company has never disclosed the status of shares held by Messrs. Harash Sethi, Larren or Malik at any time after March 2019 or commented on the above-described spike in share price and trading volume.

478.    The failure to disclose such insider swing trading (either by the Board or the insiders themselves) coupled with defendants' failure to timely disclose the material facts ultimately set forth in the Form 20-F addressed above, together with defendants' omission of

///

///

certain material facts when finally disclosing some of these material events violates federal and state securities acts and is tortious in nature.[50]

479.    On information and belief, the price of Amira has been manipulated at other times relevant to this matter, in an attempt to benefit Amira India, Chanana or his affiliates, and to the detriment of Amira investors.

## B.    CBI Files Criminal Conspiracy, Fraud, Stock Manipulation And Misappropriation of Funds Charges Against Chanana, A Former Director Of Amira And Others

480.    In May 2019, a few months after the liquidation proceeding commenced, and roughly one month after the above-described "pump and dump," India's Central Bureau of Investigation ("CBI") finally concluded its forensic audit of Amira India's financial accounts and carried out a search investigation at eight separate locations, including at least one in Delphi and at some of the premises of the accused (i.e., Chanana and other directors of Amira India, among others).

481.    The CBI registered a First Information Report ("FIR") naming Chanana and others, alleging that these individuals were involved in a criminal conspiracy to commit fraud, engage in stock manipulation and misappropriate funds, and among other things, their conduct included falsifying accounts, forging and fabricating documents and diverting funds, and as to the fraud on the banks, according to the FIR: "All the directors of the company were involved in the

///

---

[50]Pending facts to be developed and tested in discovery, Barbee may seek leave to add these individuals as defendants and plead claims against them with respect to swing trading and to plead additional claims against them, Chanana and Amira for the related failure(s) to disclose such swing trading, and/or related violations of federal or state securities acts or tortious misrepresentations (negligent and/or intentional) of material fact.

-89-

conspiracy to cheat the banks and thereby divert the funds among themselves by various acts, omission and commission and siphoned off the public exchequer."[51]

482.    In addition to naming Chanana, the FIR also levels fraud and other charges against Anita Diang, a former Director of Amira India who resigned from the Board in May 2016.

483.    Given the allegations of fraud dating back to Anita Diang's service as a Board member in 2016, if such allegations are accurate, all of the sales of Amira shares at issue herein were made in violation of the federal and state securities acts, and Barbee is entitled to rescission and damages for all such purchases, or to lost opportunity and market-adjusted damages, as well as to his pro rata portion of the ill-gotten and ill-retained gains by defendants named in this matter, as discussed below.[52]

484.    A reasonable investor would want to know about the existence of the CBI proceeding and allegations made against Chanana and others dating back to at least 2016 when deciding whether to purchase, sell or hold Amira stock.

485.    Neither Speck nor Amira has ever mentioned the CBI proceeding or allegations made therein (or disclosed whether any civil or criminal proceedings against Chanana, Amira India and/or others were still pending, nor have not disclosed the outcome of any such

///

---

[51]Barbee reserves the right to name the other directors accused by the CBI in the FIR, and possibly other directors of any of Amira's other wholly owned subsidiaries, as parties to this matter, pending facts to be developed and tested in discovery.

[52]Barbee reserves the right to name Mrs. Diang, Rajesh Arora (Managing Director of Finance for Amira India) and/or Akshay Srivastava as a party(ies) to this matter, each of whom is accused by the CBI of participating in defrauding the consortium of lenders (some or all of whom commenced the insolvency and liquidation proceeding only months before the CBI conducted its forensic account audits), pending facts to be developed and tested in discovery.

proceeding which is no longer open in any SEC filing, including the Form 20-F discussed above which was filed more than one year after the CBI forensic audits occurred and the FIR charges were made.[53]

486.     Speck or Amira should have mentioned the CBI proceeding in Note 11 to the Form 20-F for March 2019 or elsewhere, since it occurred during the period after the end of the fiscal year and the filing date for the Form 20-F and since its existence and/or outcome could have a material impact on the financials contained within such SEC filing.

487.     Instead, the section of this filing regarding the status of litigation proceedings included typical boilerplate language about the possibility of civil and criminal actions being filed in India against individuals and entities, instead of actually identifying the charging entity, describing the accusations (i.e., concerning fraud and stock manipulation, among others) and stating that such proceeding was actually pending at the time, thereby misrepresenting the material facts and omitting to state the existence of pending actions, which makes the boilerplate language about the "possibility" of actions being filed misleading.

488.     Amira should have also mentioned the FIR charges and/or underlying fraudulent conduct in both of the Forms NT-20-F filings for March 2019 (signed by Chanana) and March 2020 (signed by Speck) discussed above, unless the fraudulent results of operations occurring in the year covered by such filing were not a significant change from the results of operations for the prior fiscal year.

///

_____

[53]Barbee reserves the right to name the directors of Amira serving at any time from May 2019 to the present, in connection with the failure to disclose the CBI proceeding to the investing public, via an SEC fling or otherwise, pending facts to be developed and tested in discovery.

489.    Neither Chanana nor any defendant in this matter has publicly denied any of the
CBI's criminal changes against him, her or it at any time prior to the filing of the instant
Complaint.

490.    On information and belief, Barbee alleges and incorporates herein by this
reference the charges and accusations against Chanana in the FIR and in any subsequent charging
document filed against Chanana in a criminal matter prosecuted by an Indian agency or
governing body alleging fraud, stock manipulation and/or misappropriation of funds, as if fully
set forth herein.

491.    The conduct charged and of which Chanana is accused in the FIR constitutes
misrepresentations of material facts, omissions of material fact necessary to make other
representations of material fact not misleading, and violates state and federal securities acts, upon
which Barbee reasonably relied and proximately caused Barbee to suffer damages.

492.    If this fraudulent and otherwise criminal conduct was occurring during or prior to
the times relevant to this matter, and had such conduct been timely disclosed, Barbee would have
never invested in the Company in the first place and he would have avoided the more than
\$580,000 in out-of-pocket losses at issue herein, plus he would have realized more than \$1.2
million in gains from staying invested in the stocks he owned before selling them in order to
invest in Amira.[54]

_____

[54]The damages that Barbee and other investors could have avoided, had the Company's
fraudulent conduct been timely disclosed are material when measured against the Company's
market capitalization, since: (i) the Company's market capitalization has decreased by more than
\$200 million (or roughly 90%) since the fiscal 2017 year results were reported and it now hovers
between \$5.0 and \$10.0 million; (ii) market capitalization has fallen by roughly \$75 million since
the end of fiscal year 2018, when the March 2018 Investor Presentation illustrated a manageable
debt load and a 7.6 P/E ratio in "2019"; (iii) market capitalization has fallen by roughly \$60

493. Amira intentionally never disclosed anything about the CBI charges to induce investors to not sell (which would have caused the value of Chanana's shares to decline by millions of dollars) and/or to manipulate the share price, both of which are clear examples of a scheme to defraud and which certainly operated as a deceit upon investors.

494. Indeed, the Company's stall tactics with respect to the release of the March 2019 fiscal results (and its complete silence with respect to the CBI's allegations) are a classic example of the scheme to defraud that the federal and blue sky securities acts were designed to deter.

495. In short, the Company deliberately chose to misrepresent and/or withhold the information addressed above from the investing public for the precise reasons that the public would have wanted to know about it, would have deemed it material and should have received it.

**Events Subsequent To Trading Halt**

496. After closing on August 17, 2020 above $7.00 per share on a split-adjusted basis, the stock began trading on the pink sheets on either August 18 or 19, and the price fell below $3.50 by the close of trading on August 19, 2020.

497. The trading halt and move to the pink sheets proximately caused the share price to fall.

---

million since the close of the fiscal year 2019, during which Amira India lost its going concern assumption and Amira shareholder's equity plummeted from $241 million to negative $15 million; (iv) market capitalization fell more than $30 million (or roughly 80%) since the Company put out the September 2018 Investor Presentation, which occurred around the time the Company was aware of (but failed to disclose) the CBI charges; (v) market capitalization has fallen by $20 million since the Company received the August 2019 SEC letter; and (vi) market capitalization has fallen by roughly $12 million (or more than 50%) since Speck failed to announce on August 10, 2020 that the Company had not met (and would not meet) the SEC's conditions precedent to avoid the commencement of the delisting process within the upcoming days.

498.    The stock is still trading on the pink sheets, but the price and trading volume are down significantly from the closing price on the last day it traded on the NYSE.

499.    Although Amira publicly appealed the delisting (but then quietly withdrew such appeal), it left other statements on its website leading investors to believe that Amira was still a NYSE listed company, and most shareholders cannot call a meeting to address any of the above issues or the Company's financial status, to wit:

**A.      Amira Withdraws Appeal Of Delisting Without Press Release**

500.    After the trading halt, the NYSE advised Amira of its intention to remove Amira shares from listing and registration on the NYSE.

501.    Soon thereafter, Amira notified investors that it would be taking steps to regain listing.

502.    Amira timely filed a notice of appeal to the Committee of the Board of Directors of the NYSE regarding the Company's trading suspension and the delisting determination.

503.    Speck even spoke directly with Barbee's broker about the Company's efforts to work on the Form 20-F for the fiscal year ending March 2020, as alleged above.

504.    But in November 2020, several news organizations in India published stories concerning the CBI criminal allegations.

505.    Amira did not put out any press releases denying any of the CBI charges or file any documents with the SEC denying any of the CBI charges.

506.    Instead, on or about December 14, 2020, Amira inexplicably withdrew its appeal and it was permanently delisted later that month, which proximately caused the common stock price to fall further.

507.    Unlike its prior actions taken to bolster the share price, which were accompanied by a press release, Amira did not issue a press release or make any public comment regarding its decision to abandon the appellate process and remain on the pink sheets.

508.    Amira has no intentions of ever filing the Form 6-K for the six month period ending September 2019 or the Form 20-F for the fiscal year ending March 2020, and it has never put out a press release to disclose as much.[55]

## B.    Amira's Website Misrepresents Material Facts And Omits Material Facts Regarding Its Status As A Listed Company.

509.    The Company chose to remove both versions of the investor presentation from its website, but failed to make other obvious changes to its website that would be material to a reasonable investor, to wit:

510.    To date, sections of Amira's website continue to falsely state and/or imply that the Company is still listed on the NYSE.

511.    For example, under the "Investor FAQs" section, the page states: "[o]ur common stock is listed on the New York Stock Exchange under the symbol ANFI."

///

///

///

///

_____

[55]Amira also has no intentions of comparing the results of operations for March 2020 to the projections for such year made in the March 2018 and September 2018 Investor Presentations and no subsequent filings suggest that any of the revenue projections therein were incorrect or unfounded, creating a misleading view of the Company's financial status in a continuing effort to induce shareholders to not sell, thereby propping up the share price for Chanana.

512.    And on the "Stock information" page, the language under "Stock information"
reads "RYCE (Common Stock)" and under that line the language reads " Exchange NYSE (US
Dollar)."[56]

513.    The article at the top of the "Recent News" section on such website is titled
"Amira Nature Food, Ltd, Regains full Compliance with NYSE Minimum Average Share Price
Listing Standard . . . ."

514.    While this article was accurate when published, it is outdated and misleading,
since more recent articles discuss Amira's subsequent delisting, but none of them are included on
the Company's website in the "Recent News" section or otherwise.

515.    It is also misleading to continue using a four character ticker symbol on the
Company's website since only NYSE and NASDAQ listed companies are permitted to have four
letter ticker symbols and/or since companies trading on the pink sheets cannot use four character
ticker symbols.

516.    Even if the Company was still trading on the NYSE (which it is not), it would still
be false and deceptive to state that the Company's current ticker symbol is ANFI after the ticker
symbol changed to RYCE.

517.    Continuing to use the NYSE name and former ticker symbols ANFI and RYCE
long after delisting is a misrepresentation of material facts.

///

---

[56]After the 1:20 stock split the ticker symbol changed from ANFI to RYCE, but then it
changed to RYCFF when the stock went to the pink sheets, and then it changed to ANFIF for
some unknown and undisclosed reason, but neither RYCFF nor ANFIF (both of which are five
letter ticker symbols and thus indicate that the stock is traded over-the-counter) are mentioned on
the website.

518.    Continuing to post an outdated article at the top of a recent news section suggesting that the Company has regained NYSE compliance (while failing to address the more recent articles about the subsequent delisting), constitutes the omission of material facts necessary to make other representations of material facts not misleading.

519.    These statements on the website constitute misleading published statements or advertisements and contain misrepresentations of material facts and are meant to induce investors to not sell their shares of the Company.

520.    All of these failures to update the investing public regarding the truth of Amira's delisting and its disinterest in pursuing any relisting (which would require disclosure of news likely to negatively impact an investor's view of the Company) provide further evidence of Amira's desire to induce investors to hold and to not sell their investments in the Company.

**C.    Shareholders Cannot Call Meetings Or Obtain Updated Financials**

521.    In October 2020, Barbee sent a letter to defendants, among others, proposing a pre-filing mediation to resolve this matter.

522.    That letter included a spoliation notice and Barbee indicated he would be attending the next shareholder meeting and he would inform other investors of events occurring at such meeting.

523.    Subsequently, the Company has not scheduled its annual shareholder meeting or provided any undated financials to investors, including Barbee.

524.    The Company's Amended and Restated Memorandum and Articles of Association require that shareholder meetings occur at least annually, at a time and location determined by

///

-97-

the Board, but the "2018 Annual General Meeting Of Shareholders" was the last one to occur, and it was scheduled during and occurred in February 2019.[57]

525.    The Company has not disclosed any reason for the lack of holding shareholder meetings since February 2019 and even if COVID-19 was a concern, nothing in the operative articles of association precludes any such shareholder meeting from occurring in an electronic medium such as Skype, Zoom or other electronic forum that connects investors and Company personnel.

526.    If a valid reason exists for not holding the shareholder meetings, the Company has omitted to state facts regarding such reasons.

527.    In addition to conducting annual shareholder meetings, the Company's Amended and Restated Memorandum and Articles of Association require that fiscal results are provided to shareholders on an annual basis, but nothing has been provided to investors concerning results of operations subsequent to March 2019.

528.    The Company has not disclosed any reason for refusing to publish results of operations for periods after March 2019.

529.    If a valid reason exists for not disclosing these financial results, the Company has omitted to state facts regarding such reasons.

///

---

[57]Chanana waited until February 7, 2019 to disclose to U.S. investors the date and location of the meeting (which was to occur 18 days later in Geneva, Switzerland), even though he was aware of the date and location when signing the notice in December 2018, which is conduct consistent with an overall scheme to make it difficult for a shareholder to actually obtain the information that would be presented at such meeting and to deter them from obtaining information upon which they may act to sell their shares (i.e., it was yet another attempt to induce investors to hold their shares).

530.    The shareholder meeting notice provisions within the Company's Amended and

Restated Memorandum and Articles of Association preclude any investor with less than a 30%

stake from calling a special meeting to address financial or other issues.

531.    Even if shareholders jointly holding sufficient shares in the Company wished to

call a special meeting, such shareholders cannot provide notice in compliance with the operative

articles of association to schedule a meeting to address the latest Form 20-F (or subsequent

Company operations) given: (i) the manner in which these notice requirements are drafted, (ii)

the fact that the last annual meeting was in February 2019, and (iii) since the Company has not

publicly announced the date for the next shareholder meeting.[58]

532.    Indeed, as long as the Company refuses to schedule the annual meeting,

shareholders holding less than 30% of the shares are not able to call their own special meeting.

533.    This procedural deficiency is blocking a substantive remedy and was engineered

by the Board's failure to schedule any annual shareholder meetings, in violation of the Company's

own articles and NYSE rules governing the Company's conduct while it was publicly traded.

534.    The above-described conduct is consistent with a scheme to defraud, among other

things, and is designed to induce investors to not sell their shares.

///

---

[58]Notice would typically be provided not later than ninety (90) days after the last annual
shareholder meeting (i.e., by May 2019), but because the current year's meeting has been delayed
more than sixty (60) days after the anniversary of the February 2019 annual meeting, notice must
be provided within ten (10) days after public notice of the date of such meeting has occurred and
not more than ninety (90) days nor earlier than one hundred twenty (120) days prior to such
meeting, and since no date has been publicly announced by the Company, certain shareholders
cannot provide timely notice in accordance with the Company's Amended and Restated
Memorandum and Articles of Association, and under such articles, this lack of timely notice
"may have the effect of precluding the conduct of certain business" at any such meeting.

535.    Barbee would have sold his position in Amira and ceased purchasing additional share in the Company at various times had the Company: (i) timely and accurately disclosed material facts, (ii) not misrepresented material facts and/or (iii) not omitted to state material facts necessary to make other representations of material fact not misleading.

**B.    DAMAGES**

536.    Barbee has various damages and losses, realized and unrealized, in connection with his purchase of Amira stock, to wit:

### 1.    Securities Act Damages

#### a.    State Securities Acts

537.    The statutory damages and rescission calculation under the Securities Act of Washington with statutory interest exceeds $680,000, not including costs or the reasonable attorney fee contemplated thereunder, and defendants are jointly and severally liable for such amount.

538.    A violation of the anti-fraud portion of this state statute constitutes a "per se" violation of Washington's consumer protect act (i.e., RCW 19.86, et seq.), empowering the Court treble damages (in its discretion) for each such violation (capped at $25,000 per violation, per person), and award a reasonable attorney's fee for each such violation.

539.    Some of the damages under the Ohio Securities Act will turn on the date(s) the Company was insolvent.

540.    Other damages under the Ohio Securities Act will be calculated based on violations of the anti-fraud provision and will include both rescission for some purchases and damages for others, together with taxable costs.

541.    The total amount of rescission and damages under the Ohio Securities Act are subject to calculation and proof at hearing or trial, and are not less than $550,000.

542.    Likewise, damages under the blue sky laws of New Jersey are subject to calculation and proof at hearing or trial, and are not less than $550,000.

543.    All defendants are jointly and severally liable for the full amount, but rights of contribution between each other may exist, subject to each particular blue sky law.

### b.    Federal Securities Acts

544.    Barbee is entitled to "actual damages" or "out-of-pocket" damages, from each defendant liable for a primary violation of § 10(b) of the Securities Act of 1934 or for a primary violation of Rule 10b-g promulgated thereunder, plus costs to the extent permitted and as calculated by the rules of the forum Court, in an amount according to proof at hearing or trial and not less than $580,000.

545.    All defendants liable under § 20(a) of the Securities Act of 1934, as control persons of those liable under § 10(b) of the Securities Act of 1934 and/or under Rule 10b-5 promulgated thereunder, are jointly and severally liable with each other and with the individual(s) liable for the primary violations under § 10(b) of the Securities Act of 1934.

### 2.    Trading Losses

546.    Barbee purchased Amira stock in his non-qualified trading accounts, his traditional IRA, his Roth IRA, and in his Roth 401(k) account, at various times relevant to this matter, and his realized and unrealized losses in those purchases exceed $550,000.

///

///

### 3. Margin Interest

547. Barbee has incurred and paid more than $31,000 thousand in margin interest in connection with purchasing and holding Amira stock.

548. These interest amounts are compensable as a component of damages, or as a part of his investment in the contract, or as part of his basis in the investment or otherwise, under state and/or federal securities acts and in tort.

### 4. Statutory Interest

549. Statutory interest at the rate codified in the Securities Act of Washington at RCW 21.20.430 exceeds $100,000 thousand.

550. Compensatory interest under New Jersey's securities law is based on the New Jersey legal judgment rate over the relevant time periods, and is subject to calculation during proof at hearing or trial.

551. Compensatory interest amounts (and the basis therefore) under other state or federal securities act claims and/or in tort are subject to calculation and proof at hearing or trial.

### 5. Lost Opportunity Damages[59]

552. For reasons set forth above, Barbee ultimately sold almost all of his other investments over time and continually reinvested the proceeds in Amira as the price fell, believing that he was wisely averaging down his cost basis, among other things.

---

[59]This tort theory of damages (sometimes referred to as "lost profit" or "lost chance" damages) seeks to put an investor in the position s/he would have been in, but for the subject investments at issue, had the investor's account remained as invested prior to making the subject investments, measuring damages based on opportunities the investor realistically would have pursued, with the investor's prior investments providing a reliable measuring stick, but without giving the investor the benefit of 20/20 hindsight.

-102-

553.    Specifically, Barbee liquidated his interests in Apple, Disney, Micron, Netflix, Nordstrom, a Bitcoin trust, options in Amazon and a large gold miner.

554.    Each of these positions has increased significantly since then (and many of them have tripled or quadrupled in price, with the Bitcoin trust moving up more than 700% since Barbee sold it).

555.    Had Barbee never invested in Amira and simply left his money invested in the various investments he held before investing in Amira, his accounts would be worth at least $1.2 million more that they are today, excluding all subsequent deposits and withdrawals to these accounts during the relevant time period.

556.    Barbee's damages compensable in tort under this theory, in lieu of federal or state statutory damages, exceed $1.2 million.

### 6.    Market-Adjusted Damages

557.    During one of the greatest bull markets in history, almost all of Barbee's money has been tied up in the Company and eventually lost.

558.    Indeed, while his investments in Amira declined by roughly 95% over the past few years, the Dow Jones Industrial Average gained more than 70% while the NASDAQ Composite and the S&P 500 have each more than doubled.

559.    Had Barbee's pre-Amira investments simply performed in line with the market, his accounts would be worth at least $1.0 million more than they are today, excluding all subsequent deposits and withdrawals to these accounts during the relevant time period.

560.    Barbee's damages compensable in tort under this theory, in lieu of federal or state statutory damages, exceed $1.0 million.

### 7.  Additional Tort Damages And Disgorgement

561.    Defendants are liable for Barbee's actual damages, based on their own tortious conduct and the tortious conduct of those for whom they are vicariously liable.

562.    Generally, these damages in tort can be increased (or decreased) under both of the lost opportunity and/or market-adjusted loss theories mentioned above, but here, if either or both theories is applied, the damages will only increase.

563.    Defendants are not entitled to retain, and should be ordered to disgorge to Barbee, his pro-rata portion of defendants' ill-gotten and ill-retained gains in connection with their tortious conduct, pursuant to the Restatement of Torts (Second), common law or otherwise.

564.    Pre-judgment interest on all liquidated sums or amounts subject to precise calculation and compensable in tort may be permitted, along with post-judgment interest at the legal rate from the date of judgment until paid.

### 8.  Tax on Conversions

565.    At the end of 2018, Barbee converted the shares of the Company in his traditional IRA to a Roth IRA, paying thousands of dollars in federal, state and/or local taxes, believing that the shares would surely appreciate later, and being unaware of the wrongful conduct alleged herein.

566.    Barbee would not have converted shares in 2018 had he known that: (i) Amira India was insolvent or in liquidation proceedings prior to 2019; (ii) Chanana was litigating his debt to equity conversion prior to 2019; (iii) SEC filings prior to 2019 contained false material information; or (iv) the CBI had received complaints regarding Amira's fraudulent conduct and/or had begun investigating such complaints prior to 2019.

567.     In 2019, Barbee again converted the remaining shares in a traditional IRA to a Roth IRA, again paying thousands of dollars in federal, state and/or local taxes in connection with such conversion, and again being unaware of the reasons to avoid doing so

568.     Barbee would not have converted the shares at the end of calendar year 2019 if he would have known: (i) any of the facts set forth in the paragraph above; (ii) that the balance sheets in either the March 2018 Investor Presentation or in the September 2018 Investor Presentation were inaccurate or contained misleading calculations; (iii) Amira had received the August 2019 SEC letter announcing conditions precedent to delisting; or if (iv) the results for the fiscal year ending March 2019 would have been timely reported in 2019; or (v) the CBI had registered the FIR in 2019 and advanced criminal conspiracy, fraud and stock manipulation charges against Chanana and others.

569.     These tax amounts are compensatory, consequential or incidental damages and are recoverable under state and/or federal securities acts and/or in tort, and are subject to calculation and proof at hearing or trial.

### 9.     Tax-Adjusted Damages

570.     Any judgment in this matter may be subject to taxes that Barbee should have avoided, but for defendants' wrongly conduct.

571.     A number of the transactions at issue occurred in qualified accounts and/or accounts in which after-tax dollars were used to purchase the securities at issue, and Barbee would have been able to withdraw the earnings and profits on such investments from these accounts without paying income tax or capital gains tax.

///

572.    The judgment amount should be adjusted to reflect any federal, state and/or local

tax that may be assessed on any judgment amount or a portion thereof, if any, plus any additional

taxes associated with returning the amount of such judgment attributable to losses or damages

incurred in after-tax accounts back into such accounts, plus any additional taxes incurred

returning Barbee to his pre-injury state (all of which would have been avoided, but for

defendants' wrongly conduct) in an amount according to proof at hearing or trial.

573.    These tax amounts are compensatory, consequential or incidental damages and are

recoverable under state and/or federal securities acts and/or in tort, and are subject to proof at

hearing or trial and not less than $150,000.

### 10.    Reasonable Attorney's Fee

574.    RCW 21.20.430 of Washington's blue sky law mandates a reasonable attorney

fee to the prevailing investor but does not contemplate attorney's fees to any prevailing

defendant.

575.    A reasonable attorney fee in this matter would equal or exceed 30% of the

statutory damages, statutory interest and statutory costs set forth above, and would be not less

than $200,000.

### FIRST CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Section 10(b) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder

576.    Barbee realleges and incorporates herein by this reference the above allegations,

as if fully set forth herein.

577.    Defendants, and each of them, by means or instrumentalities of interstate

commerce, or the facilities of a national securities exchange (including the NYSE), did

knowingly, intentionally and with gross recklessness and deliberate recklessness, and acting with *scienter*, in connection with the purchase or sale of Amira stock by Barbee: (i) make misrepresentations of material facts and/or omit to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (ii) employ a device, scheme or artifice to defraud; and/or (iii) engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon any person and which did operate as a fraud or deceit upon Barbee in connection with his purchases or sales of Amira stock.

578.    Barbee reasonably relied on defendants' conduct, to his detriment, and such wrongful conduct by defendants, and each of them, proximately caused him to experience economic loss.

579.    Each individual defendant certified various SEC filings under Sarbanes-Oxley, and each such filing contained misrepresentations of material fact and/or omissions of material fact, as alleged above or otherwise, and each of these certifications constitutes a primary violation of the federal securities act at issue.

580.    Defendants, and each of them, violated § 10(b) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder.

581.    None of the defendants has any affirmative defense(s) to the above-allegations or in connection with his or its violation(s) of this statute.

582.    Defendants are liable to Barbee for damages and costs to the extent permissible under this statute in an amount according to proof at hearing or trial and not less than $580,000.
///

## SECOND CLAIM FOR RELIEF (AGAINST ALL INDIVIDUAL DEFENDANTS)

### Section 20(a) of the Securities Act of 1934

583.    Barbee realleges and incorporates herein by this reference the above-allegations, as if fully set forth herein.

584.    Each individual defendant is deemed a control person of Amira under § 20(a) of the Securities Act of 1934.

585.    Each individual defendant: (i) participated in the daily management of Amira's finances and operations concerning such finances; (ii) had the ability to influence or control, and did influence or control, directly or indirectly, the Board of Director's decision-making for the Company; and (iii) had direct supervisory involvement in day-to-day operations of the Company.

586.    Each defendant is liable, pursuant to § 20(a) of the Securities Act of 1934, for the primary federal securities act violation(s) alleged above, in his capacity as a control person of Amira and/or in his or its capacity as a control person of such individual whose conduct constituted such primary securities act violation(s).

587.    Chanana was a control person of Wacha, Sethi and Speck at all times such individuals were employed by Amira and in their respective capacities as CFO for the Company, either in his capacity as the largest shareholder of Amira (and thereby being able to unilaterally elect the Board of Directors, who select the Company officers) or otherwise.[60]

_____

[60]Messrs Harash Pal Sethi, Mohit Malik and Robert Wagman, in their capacity as Directors of the Company were also deemed control persons of the Company and of the CFOs, and they are jointly and severally liable with others for Barbee's damages under this section of the federal securities act at issue, and as control persons under the various state securities acts at issue, and Barbee respectfully reserves the right to name them as parties to this matter in their capacity as control persons, based on facts to be developed and tested in discovery.

588.    None of the defendants has any affirmative defense(s) to the above-allegations or in connection with his or its violation(s) of this statute.

589.    Defendants, and each of them, are jointly and severally liable to Barbee for damages and costs to the extent permissible under this statute, in an amount according to proof at hearing or trial, and not less than $580,000.

### THIRD CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

#### Ohio Securities Act

590.    Barbee realleges and incorporates herein by this reference the above-allegations, as if fully set forth herein.

591.    Ohio Revised Code ("ORC") § 1707.44(D) states that "[n]o person who is an officer, director or trustee" of an issuer shall cause any such security "of or for the issuer" to be sold to a purchaser at a time when "the liabilities of the issuer exceed its assets" without "disclosing the fact of the insolvency to the purchaser."

592.    Amira was insolvent on one or more days on which Barbee purchased shares in the Company.

593.    The date(s) that Amira was insolvent were or would be material to a reasonable investor.

594.    However, neither Sethi, Speck nor Chanana disclosed the fact of Amira's insolvency to Barbee at the time of any of his purchases of shares in the Company or at any other time, prior to August 2020.

595.    It is a separate violation of ORC § 1707.44(F) for any person (including officers and directors of an issuer) to "sell, cause to be sold, offer for sale, or cause to be offered for sale"

any security at a time when such person knows that the liabilities of the issuer exceed the fair market value of its assets.

596.    As set forth above, neither the issuer nor any of the defendants disclosed until August 2020 that Amira's liabilities exceeded the fair market value of its assets or that Amira India's liabilities exceeded the fair market value of its assets at the end of the fiscal year ending March 2019 and/or during prior and/or subsequent date(s)

597.    Sethi, Speck and Chanana each caused common shares of the Company to be offered for sale at a time when they knew that the Company's liabilities exceeded its assets, thereby violating the statute at issue.[61]

598.    Such conduct by these defendants, in failing to disclose the insolvency or falsely claiming that Amira was not insolvent at a time when it was insolvent, is deemed deceptive under this blue sky law.[62]

599.    Unlike the federal rules and regulations, which require *scienter* (i.e., an intentional or grossly reckless standard), the Ohio Securities Act did not codify any such burden for investors when pleading violation of the anti-fraud provisions, and to the contrary, omissions and

///

///

---

[61]No claim is currently pled against Wacha for violations of Ohio's blue sky statute ORC §§ 1707.44(D) or 1707.44(F), although Barbee may seek leave to amend this pleading to allege such claim(s), pending the outcome of facts to be developed and tested in discovery.

[62] Moreover, the person charged with such deceptive conduct cannot defend on the ground that s/he was unaware of the insolvency, if such information could have been discovered through the exercise of reasonable diligence, since each person is presumed or deemed to know of such information if it could have been obtained through the exercise of reasonable diligence, pursuant to ORC § 1707.29.

misrepresentations of material fact by an issuer or any of its officers or control persons, and by anyone selling a security, are subject to a strict liability standard.[63]

600.    A seller's lack of knowledge that s/he is making a misrepresentation of material fact or omitting to state a material fact necessary to make other representations of material fact not misleading or of otherwise committing a primary violation of this blue sky law, is not a defense under this state act.

601.    Regardless, each defendant acted with *scienter* when misrepresenting material facts and omitting to state material facts necessary to make other representations of material fact not misleading, as alleged herein.

602.    Even if Amira was solvent at the time the security was sold to Barbee, it is a violation of ORC § 1707.44(B)(4) of this securities act for anyone to knowingly make (or cause to be made) a false statement of material fact in any written statement for the purpose of selling a security in the State of Ohio.

603.    The above-addressed Forms 20-F, 6-K and NT-20-F, along with the March 2018 and September 2018 Investor Presentations contain numerous false statements of fact and were issued for the purpose of selling securities all over the country, including in the State of Ohio.

604.    Each of these investor presentations and SEC filings mentioned above also violate ORC § 1707.44(J) to the extent each constitutes an "advertisement" or a "published statement"

_____

[63]Wacha, Sethi, Speck and Chanana are each liable for violations of the anti-fraud provisions of the federal and state securities acts pled herein (and have no defense thereto) with respect to any misrepresentation or omission of any material fact occurring in connection with the offer, purchase or sale of a security that relates to any filing certified by them under Sarbanes-Oxley, and Chanana is also liable for the conduct of these CFOs under the federal and state securities acts in his capacity as one of their control persons.

-111-

and was made by an individual or entity who "knows that the statement or advertisement is false in any material respect."

605.    And similar to the anti-fraud statutes within its federal securities act counterparts, engaging in a fraudulent act or practice while selling a security violates ORC § 1707.44(G) of Ohio's securities law.

606.    ORC § 1707.44(G) states that no person "shall knowingly engage in an act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited" while selling securities.[64]

607.    A single violation of any of the above-cited securities act code sections entitles the purchaser of the security to rescission of the purchase price plus taxable costs, pursuant to ORC § 1707.43(A).

608.    The issuer and each person who "participated in or aided the seller in any way in making such sale" is jointly and severally liable along with the seller.

609.    Defendants, and each of them, participated in or aided the seller in each of these transactions and each is jointly and severally liable along with the others.

///

///

///

///

_____

[64]This chapter defines "fraud", "fraudulent acts" and "fraudulent practices" to mean, among other things "any devise, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation or promise . . . and any act, practice, transaction or course of business relating to the purchase or sale of securities that is fraudulent or that has operated or would operate as a fraud upon the seller or purchaser."

-112-

610.    Pursuant to ORC § 1707.41(A), each person offering a security for sale by means of an advertisement which contains a false statement or omits any material fact is liable to a purchaser relying on such advertisement for losses and damages suffered by such reliance.[65]

611.    Since Amira is liable to Barbee under ORC § 1707.41(A), each of its Directors is liable unless s/he shows that s/he had no knowledge of the publication or had just a reasonable grounds to believe the statement therein to be true or the omission of facts to be not material, pursuant to ORC § 1707.41(B)(1).

612.    Each Director held so liable has rights of contribution between each of the other Directors held so liable, but any right such Director has against the Company is subrogated to Barbee's rights against the Company, pursuant to ORC § 1707.41(B)(2).[66]

613.    Each of the defendants "shall be deemed to have had knowledge of any matter of fact, where in the exercise of reasonable diligence, he should, prior to the alleged commission of the offense in question, have secured such knowledge," pursuant to ORC § 1707.29.

614.    Defendants are strictly liable for the above-alleged statutory violations.

615.    None of the defendants has any affirmative defense(s) to the above-allegations or in connection with his or its violation(s) of this statute.

///

///

_____

[65]All defendants other than Wacha are liable for the violations of this statute occurring in connection with the March 2018 and/or September 2018 Investor Presentations.

[66]In addition to Chanana, Barbee reserves the right to add the Directors serving at any time relevant to either or both of the investor presentations mentioned above as parties to this matter, pending facts to be developed and tested in discovery.

616.    Defendants, and each of their control persons, are liable, jointly and severally, to

Barbee for statutory damages and costs, to the extent permitted by this statute, in an amount

according to proof at hearing or trial and not less than $580,000.

## FOURTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Securities Act Of Washington

617.    Barbee realleges and incorporates herein by this reference the above-allegations,

as if fully set forth herein.

618.    A number of the stock purchases at issue were made through a Washington

licensed broker and broker-dealer (i.e., LaCava and Ameriprise), both of whom are subject to

compliance with and liable for violations of the Securities Act of Washington, which applies to

all sellers, control persons, and persons who materially aid or participate in the transaction,

including an issuer of securities.

619.    For purposes of this statute, under Washington and federal common law, an

issuer of securities and everyone else acting as a "substantial contributing factor" to the sale, such

as the CFOs and other signatories to filings identified above, are each deemed a "seller."

620.    Moreover, even if not deemed "sellers", the Company's officers and directors are

liable for violations of the anti-fraud provisions of this state act, along with the sellers for

"materially aiding in the transaction", and the directors are also liable under RCW 21.20.430(3)

in their capacity as "control persons" of the issuer.[67]

_____

[67]The anti-fraud statute in Washington, RCW 21.20.010, prohibits the misrepresentation
of a material fact or the omission of a fact necessary to make other representations of material
fact not misleading in connection with the purchase or sale of a security, as well as prohibiting
general schemes to defraud and acts or practices that would operate as a fraud or deceit upon any
person (and not just upon a purchaser of securities).

-114-

621.    Each defendant committed a primary violation of the anti-fraud provisions of the Washington securities law, pursuant to the above-alleged conduct or otherwise.

622.    Each defendant directly or indirectly controlled each of the other defendants liable for the conduct alleged herein.

623.    RCW 21.20.430(1) imposes liability on sellers who violate RCW 21.20.010 and RCW 21.20.430 imposes liability on the control persons of such seller(s), and on the officers and directors of such seller(s), and on those who materially aid in the transaction.

624.    Like the Ohio Securities Act, the Securities Act of Washington does not require that a defendant act with *scienter* to be held liable thereunder.

625.    A seller's lack of knowledge that s/he is making a misrepresentation of material fact or omitting to state a material fact necessary to make other representation of material fact not misleading or of otherwise committing a primary violation of this blue sky law, is not a defense to RCW 21.20.010 or to liability therefor under RCW 21.20.430.

626.    Indeed, each defendant committing the above-alleged primary violation(s) of this act is strictly liable for such violations.

627.    Even if lack of knowledge was a defense to a primary violation of the anti-fraud provisions of this act (which it is not), defendants, and each of them, had knowledge of the material facts that were misrepresented and of the facts they omitted to state that were necessary to make other representations of material fact not misleading.

628.    Each defendant knew, or in the exercise of reasonable care would have known, of the existence of the facts by reason of which liability to Barbee exists.

///

-115-

629.    None of the defendants has any affirmative defense(s) to the above-allegations or in connection with their violation(s) of this statute.

630.    Each of the defendants is liable as a control person for the anti-fraud provision violations committed by the other defendants, each of the individuals is liable as an officer or director of the issuer, and each defendant materially aided in the sales and in the conduct giving rise to liability under this statute.

631.    Based on the violations of RCW 21.20.010 by defendants, and each of them, Barbee is entitled to rescission with respect to the Amira shares he still holds, which is the total amount he paid to purchase and hold the shares (including margin interest), plus interest on the purchase price at 8% from the date of purchase of such shares, plus costs and a reasonable attorneys' fee, less any income or amount received on a tender, pursuant to RCW 21.20.430.

632.    Based on the violations of RCW 21.20.010 by defendants, and each of them, Barbee is entitled to damages with respect to the shares of Amira he previously sold, which is equal to the amount that would be recoverable on a tender (which includes the purchase price, margin interest, statutory interest, costs and a reasonable attorney's fees), less proceeds from the sale of the security, less interest at 8% on such proceeds from the date of sale of such shares, pursuant to RCW 21.20.430..

633.    Barbee's statutory damages and rescission calculation (including margin interest and statutory interest) exceeds $680,000, excluding costs and a reasonable attorney's fee.

634.    Pursuant to RCW 21.20.430(3), defendants are jointly and severally liable for Barbee's statutory damages, rescission, interest, costs and fees, but those defendants liable solely as a control person (if any) have rights of contribution from each other.

635.    In addition to the mandatory damage calculation under this statute, the Court has discretion to increase the judgment in an amount according to proof at hearing or trial, based on the number of separate violations of RCW 21.20.010 made by each of the defendants, pursuant to Washington's consumer protect act, RCW 19.86, et seq., as alleged above.

## FIFTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Uniform Securities Law (1997): New Jersey's Securities Act

636.    Barbee realleges and incorporates herein by this reference the above-allegations, as if fully set forth herein.

637.    Pursuant to Title 49 § 3:52 of the Uniform Securities Law (1997), it unlawful for any person in connection with the offer, purchase or sale of any security to: (i) make an untrue statement of material fact; (ii) omit a material fact necessary to make the statements made, in light of the circumstances under which they are made, not misleading; (iii) employ any device, scheme or artifice to defraud; or (iv) engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

638.    The anti-fraud provisions of this blue sky law are set forth in N.J.S.A. 49 § 3-71(a), which creates a private right of action against any person who offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or by employing any device, scheme or artifice to defraud or by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit against any person.

///

-117-

639.    Each defendant violated the anti-fraud provisions of 49 § 3-71(a), based on the acts, omissions and conduct alleged herein, and each knew of the untruth or omission of material facts at issue herein and intended to deceive Barbee and Barbee has suffered a financial detriment.

640.    Like the Ohio and Washington securities acts addressed above, Barbee need not establish *scienter* as an element of defendants' liability under this state statute, but regardless, each defendant acted and omitted to act with *scienter* when making misrepresentations and omissions of material fact or as otherwise alleged above.

641.    Pursuant to 49 § 3-71(c), each defendant violating the anti-fraud provisions is liable to Barbee for rescission of the purchase price for the Amira shares he still holds, plus damages for the Amira shares he has already sold, together with costs and interest at the New Jersey legal judgment rate.

642.    Pursuant to 49 § 3-71(d), each defendant who directly or indirectly controls or controlled any defendant seller liable for an anti-fraud provision violation under 49:3-71(a), and each officer and director of any such seller and each employee who materially aids in the sale or in the conduct giving rise to the liability, is also liable jointly and severally with and to the same extent as such seller, unless such person did not know and in the exercise of reasonable care could not have known of the existence of the facts which give rise to such liability.

643.    Each of the defendants is liable as a control person of the other defendants for the anti-fraud violations alleged herein, each of the individuals is an officer or director of the issuer, and each defendant materially aided in the sale and in the conduct giving rise to the liability.

///

-118-

644.    Each defendant knew, or in the exercise of reasonable care would have known of the existence of the facts which give rise to liability herein.

645.    Any right of contribution between the defendants liable as control persons does not decrease Barbee's statutory rights of recovery.

646.    Defendants are jointly and severally liable to Barbee for statutory rescission, damages, interest and costs in an amount according to proof at hearing or trial and not less than $580,000.

## SIXTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Common Law Fraud / Securities "Holder's Claim"

647.    Barbee realleges and incorporates herein by this reference the above-allegations, as if fully set forth herein.

648.    Defendants, and each of them: (i) knowingly and intentionally made misrepresentations of material fact to Barbee through SEC filings, the March 2018 Investor Presentation, the September 2018 Investor Presentation and/or in statements made directly to Barbee's agent (i.e., LaCava); and (ii) did so with the intent to induce Barbee to hold on to the securities he had already purchased.

649.    Barbee reasonably relied on these representations to his detriment and did not sell his holdings in Amira, which proximately caused him to suffer damages for which defendants are liable based on the reasoning within *Gutman v. Howard Sav. Bank*, 748 F. Supp 254 (D.N.J. 1990), or otherwise.

650.    Each individual certifying an SEC filing under Sarbanes-Oxley has a duty to shareholders of the Company to ensure that such filing lacks misrepresentations of material fact

-119-

and does not omit to state any fact necessary to make any representation of material fact not misleading.

651.    An SEC filing containing misleading information can form the basis of a securities "holder's claim." [see, e.g., *In re Washington Mutual, Inc. Secs. Litig.*, 2010 U.S. Dist. LEXIS 113088, at *17-18 (W.D. Wash. Oct. 25, 2010)].

652.    At times when the Company and individual defendants had a duty to disclose material facts, pursuant to NYSE rules and/or the Company's operative articles of association or otherwise, each of them intentionally and deliberately failed to speak, and they omitted to state material facts, which made other representations, under the circumstances in which they were made, misleading.

653.    When having a duty to speak regarding the financial status of the Company and/or when speaking regarding such financial status (even absent a duty to do so), defendants, and each of them, have a duty to disclose all material facts relevant to such status, not just those which describe the Company in a positive light, and they have a duty to not selectively omit material facts necessary to make the other representations of material fact not misleading.

654.    When issuing financial disclosures, the Company should have disclosed the SEC's prior notice concerning the conditions precedent to avoid delisting and the related SEC deadline, Amira India's insolvency, the internal litigation involving Chanana and the CBI's criminal charges of fraud and stock manipulation against Chanana, among other things, since each of those facts is material to the financial condition of the Company and would be important to a reasonable investor when deciding whether to purchase, sell or hold shares in the Company.

///

-120-

655.    Reasonably believing that defendants would not misrepresent or omit to state material facts, and in reliance on defendants' conduct, and being otherwise unaware of the forewarned August 16, 2020 delisting date, the internal litigation between Chanana and Amira's operating subsidiary or the true state of Amira India's financial position or liquidation status (all of which were withheld by Amira from the public until trading in the company on the NYSE was halted), Barbee continued to hold his Amira stock.

656.    Moreover, Barbee continued holding his shares being unaware of the CBI's FIR from May 2019 which contained fraud, stock manipulation and criminal conspiracy charges against Chanana and others that neither Amira nor Chanana have ever disclosed (or denied).

657.    Had Barbee been aware of any of the criminal conspiracy, fraud, stock manipulation or misappropriation of funds allegations (which date back to at least August 2016), he never would have invested in Amira in the first place and all of the losses at issue would have been avoided.

658.    Defendants' conduct complained of above was designed to induce shareholders like Barbee to not sell securities, which could have significantly lowered the value of Chanana's Amira stock, among other things.

659.    Defendants profited in the form of ill-gotten and ill-retained gains, among other things, from investors not selling their shares of Amira at times when defendants were inducing such conduct.

660.    None of the defendants has any affirmative defense(s) to the above-allegations or in connection with his or its tortious conduct.

///

661.     Each defendant is primarily liable for his or its own conduct and is vicariously or secondarily viable (in his or its capacity as a control person or principal) for the tortious conduct and scheme to defraud committed by his or its agent or others, under a theory of respondeat superior or otherwise.

662.     Defendants are jointly and severally liable to Barbee for actual damages, out-of-pocket damages, market adjusted damages and lost opportunity damages, and should disgorge Barbee's pro-rata share of defendants' ill-gotten and ill-retained gains, in an amount according to proof at hearing or trial and not less than $1.2 million.

## SEVENTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Negligent Misrepresentation Of Material Fact

663.     Barbee realleges and incorporates herein by this reference the above-allegations, as if fully set forth herein.

664.     Defendants, and each of them, breached one or more duties owed to Barbee to disclose all material facts (and to not omit any material facts) in connection with his purchase of any share of Amira and/or when inducing him to hold and to not sell Amira securities, proximately causing Barbee harm, in an amount according to proof at hearing or trial.

665.     Defendants, and each of them: (i) negligently made misrepresentations of material fact to Barbee through SEC filings, the March 2018 and September 2018 Investor Presentations and/or statements made directly to Barbee's agent (i.e., LaCava); and did so (ii) with the intent to induce Barbee to hold and to not sell the securities he had already purchased, in reliance on such representations.

///

-122-

666.   Barbee reasonably relied on defendants' negligent misrepresentations and omissions of material fact, which proximately caused him damages.

667.   None of the defendants has any affirmative defense(s) to the above-allegations or in connection with his or its tortious conduct.

668.   Each defendant is primarily liable for his or its own conduct and is vicariously or secondarily viable (in his or its capacity as a control person or principal) for the tortious conduct and scheme to defraud committed by his or its agent or others, under a theory of respondeat superior or otherwise.

669.   Defendants are jointly and severally liable to Barbee for actual damages, out-of-pocket damages, market adjusted damages and lost opportunity damages, and should disgorge Barbee's pro-rata share of defendants' ill-gotten and ill-retained gains, in an amount according to proof at hearing or trial and not less than $1.2 million.

## PRAYER FOR RELIEF AND JURY REQUEST

Wherefore, Barbee respectfully requests trial by jury and that the Court enter judgment in his favor, and against defendants, and each of them, jointly and severally, as follows:

A.   For compensatory damages in an amount according to proof at hearing or trial and not less than $550,000;

B.   For margin interest incurred and paid in an amount according to proof at trial or hearing and not less than $31,000;

C.   For statutory interest, a reasonable attorney's fee and costs, pursuant to statute or common law, in an amount according to proof at hearing or trial and not less than $100,000 thousand in interest, $200,000 thousand in attorney's fees and costs as taxed or otherwise;

D.      For lost opportunity damages in an amount according to proof at hearing or trial and not less than $1.2 million;

E.      For market-adjusted damages in an amount according to proof at hearing or trial and not less than $1.0 million;

F.      For federal, state and any local taxes paid on converting Amira stock from traditional IRA accounts to Roth accounts and for additional tax-adjusted damages as alleged above, in an amount according to proof at hearing or trial and not less than $150,000;

G.      For disgorgement by each defendant of Barbee's pro-rata share of all ill-gotten and ill-retained gains in Amira stock occurring in connection with defendants' wrongful conduct alleged above, in an amount according to proof at hearing or trial; and

H.      For such other and further relief in Barbee's favor as this Court may deem just and proper, including without limitation, the discretionary treble damages codified at RCW 19.86, et seq. or otherwise.

Respectfully submitted this 19th day of June, 2021, by:

James K Barbee, pro se
Ohio license No. 0090306
Oregon license No. 070242 (inactive)
Washington license No. 29557 (inactive)
4723 Saddletop Ridge Lane
Mason, Ohio 45040
(513) 400-7511
jim@barbeelawfirm.com